## In re IAC/INTERACTIVE CORP.

### C.A. No. 3486–VCL.

Court of Chancery of Delaware.

Submitted: March 22, 2008.
Decided: March 28, 2008.

---

474

Kevin G. Abrams, Esquire, A. Thompson Bayliss, Esquire, T. Brad Davey, Esquire, Nathan A. Cook, Esquire, Abrams & Laster, Wilmington, DE; Richard B. Harper, Esquire, Baker Botts, LLP, New York City, for the Liberty Parties.

Kenneth J. Nachbar, Esquire, Theodore A. Kittila, Esquire, Jeremy D. Eicher, Esquire, Morris Nichols Arsht & Tunnell, LLP, Wilmington, DE; Theodore A. Mirvis, Esquire, Paul K. Rowe, Esquire, Marc Wolinsky, Esquire, Ian Boczko, Esquire, Garrett B. Moritz, Esquire, Andrew Houston, Esquire, Lauren M. Kofke, Esquire, Wachtell, Lipton, Rosen & Katz, New York City, for the IAC Parties.

## OPINION

LAMB, Vice Chancellor.

At the core of the dispute before the court is a proposal by IAC/InterActive Corp. to spin-off four of its subsidiaries as independent public companies ("spincos"), while remaining a public company itself. The immediate issue is whether, absent the consent of the owner of IAC's high-vote stock having a majority of the voting power, the capital structure of the spincos may be set up on the basis of a single class of common stock all having the same voting rights.

To fully grasp the unusual character of this dispute requires an understanding of two basic facts that rule the governance of IAC. IAC has a dual class voting structure in which Liberty Media Corp. owns all of the high-vote Class B common stock constituting a majority of the voting power of IAC. But, Liberty has granted an irrevocable proxy to Barry Diller, IAC's Chairman and CEO, to vote all of the IAC shares beneficially owned by Liberty or its affiliates. That proxy dates back to the formation of IAC's predecessor in the early 1990s and will only terminate on Diller's death, disability, or relinquishment of the role of CEO at IAC. Thus, in a sense, both Diller and Liberty possess attributes of being IAC's majority stockholder, although Diller has the present ability to exercise the majority voting power.[1] The relationship between and among Diller, Liberty, and IAC is further defined and circumscribed by a stockholders agreement and a governance agreement, which were last amended in 2005. The proper interpretation of those agreements is at issue in this case.

In recent years, Liberty has publicly expressed dissatisfaction with IAC's performance and has searched for ways to divorce itself from IAC and Diller. In early 2007, IAC and Liberty held negotiations on a proposal to swap IAC assets for Liberty's IAC shares that would have resulted in a separation of the two businesses, but they were unable to reach agreement on economic terms. Some months later, IAC's management began to consider the spin-off and, in November 2007, the IAC board of directors preliminarily approved and publicly announced the general terms of such a proposal. The IAC board has yet to consider many aspects of the proposed transaction including, most importantly, the capital and voting structures of the spincos.

A dispute has arisen, however, between IAC's management (including Diller), on the one hand, and Liberty (including its Chairman, John Malone), on the other, over the question of whether or not to replicate the IAC two-tiered voting structure in the spincos. Liberty takes the position that various provisions of the stockholders and governance agreements give Liberty the right to consent to a single-tier spin-off and require Diller to oppose any such transaction if Liberty does not consent. Diller and IAC maintain the contrary position. This dispute came to a head on January 16, 2008, at a meeting of the IAC board of directors, when Diller informed Malone that he expected to recommend a single-tier spin-off and would use the proxy to vote Liberty's shares in favor of that proposal, in the event a stockholder vote was necessary. Malone protested and, together with Liberty's other board representative, left the meeting.

Diller and IAC were the first to sue. In a complaint filed on January 22, 2008, they sought a declaratory judgment to the ef-

---

1. The situation is made even more complex by two other circumstances. First, Diller's proxy will not cover the shares of the spincos. Thus, if the spin-off happens, Diller will give up his ultimate voting control in those corporations. At the same time, Liberty, will gain the power to vote its shares in the spincos. If the spin-off happens on the basis of a two-tiered voting structure, Liberty will gain majority voting control. If the spin-off occurs on a single-tier basis, Liberty will have approximately 30% of the voting power in each of the spincos, while retaining its high-vote stock in IAC. Second, if, as has been proposed in the past, Liberty and IAC reach agreement on a plan to swap IAC assets for Liberty's IAC shares, Diller will have the right to exchange any low-vote IAC shares he holds for Liberty's high-vote shares. In that event, it is possible that Diller would end up owning a majority of IAC's voting power in his own right.

fect that a single-tier structure would not violate either the terms of the relevant agreements or the fiduciary duties of the IAC board of directors. Liberty countersued for declaratory relief on January 24, but soon took a more aggressive stance. Asserting that the proxy had been terminated as the result of Diller's repudiation of his contractual duties, Liberty entities that collectively own a majority of the voting power of IAC executed and delivered written consents purporting to take a number of actions, including removing Diller and others from the IAC board of directors and replacing them with Liberty designees. That same day, January 28, 2008, Liberty and its affiliates brought suit pursuant to section 225 of the Delaware General Corporation Law seeking an order validating the actions purportedly taken.

After consolidating the three actions, the court conducted a five-day expedited trial on March 10–14, 2008. The trial testimony centered on (1) the history of the negotiation of the agreements establishing and regulating the unusual governance structure of IAC and (2) Liberty's claim that the proposed spin-off amounts to a breach of fiduciary duty on the part of the IAC parties.

For the reasons discussed in this opinion, the court concludes that Liberty has failed to demonstrate that Diller has breached or threatened to breach any contractual duty he owes to Liberty. In particular, the court rejects Liberty's claim that the proposed single-tier spin-off gives rise to any right of consent on Liberty's part. It follows that the proxy remains in effect, with the consequence that the Liberty parties who purported to execute written consents on January 28, 2008, lacked the power to vote Liberty's shares in IAC. Thus, the court will enter judgment in the section 225 action in favor of the defendants. The court also concludes

that Liberty's various other contract-based objections to the proposed spin-off lack merit and should be dismissed on the basis of the record that now exists.

Finally, the court concludes it is premature to consider the claims relating to the fiduciary duties of the IAC board of directors. The simple, inescapable fact is that the IAC directors have not yet finally authorized the spin-off and have not even considered many of the essential terms of that transaction, including the voting structure of the spincos. While the court agrees with IAC that a single-tier voting structure for the spincos would not violate the governance agreements or any black-letter rule of Delaware law, Liberty's challenge to the ultimate decision of the IAC board to authorize the spin-off will, of course, depend on the decisions actually made and the record of the directors' deliberations. Because there is no ripe dispute, the court declines to make any advisory rulings on this subject. Rather, the court will retain jurisdiction over these claims for later resolution on a more complete record, if the need arises.

## I.

### A. *The Parties*

IAC is a Delaware corporation that owns and operates over 60 companies in the media and internet sectors. Among its more well-known brands are the HSN Television Network, Cornerstone Brands, Ticketmaster, Lending Tree, Interval International, Ask.com, and RealEstate.com. As provided in IAC's certificate of incorporation, the common stock of IAC is organized according to a two-tier voting structure. Shares of IAC common stock are entitled to one vote per share. Shares of IAC Class B common stock are entitled to 10 votes per share. Valuing all of IAC's outstanding shares at the closing market price of the company's common stock on

March 6, 2008, IAC's market capitalization was approximately $5.4 billion.

Liberty is a Delaware corporation that owns interests in electronic retailing, media, communications, and entertainment businesses. Through its wholly owned subsidiaries, Liberty is the beneficial holder of 57,619,809 shares of IAC's common stock and 1,176,594 shares of IAC's Class B common stock (collectively, the "Liberty IAC shares"). These shares represent 21.2% of IAC's equity and 13.7% of IAC's outstanding voting power. The subsidiaries through which Liberty beneficially owns the Liberty IAC shares are LMC Silver King, Inc., Liberty HSN II, Inc., LMC USA VIII, Inc., LMC USA IX, Inc., LMC USA XI, Inc., LMC USA XII, Inc., LMC USA XIII, Inc., LMC USA XIV, Inc., LMC USA XV, Inc., and Liberty Tweety, Inc. (collectively, the "Liberty Entities"). Due to its 99% equity interest and 99% voting interest in BDTV Inc., BDTV II Inc., BDTV III Inc., and BDTV IV Inc. (collectively, the "BDTV Entities"), Liberty is also the beneficial holder of 22 shares of IAC common stock and 24,423,404 shares of IAC Class B common stock held by the BDTV Entities.[2] These shares represent 8.78% of IAC's equity and 48% of IAC's voting power. Thus, through the Liberty Entities and the BDTV Entities, Liberty is the beneficial owner of 29.9% of IAC's equity and 61.7% of IAC's voting power.

John Malone is the Chairman of the board of Liberty. Gregory B. Maffei is Liberty's CEO. William H. Berkman is an independent director of IAC designated by Liberty.

Defendant Barry Diller is the Chairman of IAC, a position he assumed in a predecessor entity in August 1995. Diller is also the CEO of the company and the beneficial owner of 8,578,998 shares of common stock. He owns no shares of Class B common stock. Diller owns options to purchase 2,400,000 shares of common stock at $35.58 per share and options to purchase 1,400,000 shares of common stock at $47.90 per share. Importantly, Diller controls the voting rights of Liberty's IAC Shares through proxy rights granted to him in an Amended and Restated Governance Agreement among Liberty, IAC, and Diller (the "2005 Governance Agreement")[3] and an Amended and Restated Stockholders Agreement between Liberty and Diller (the "2005 Stockholders Agreement").[4] Through the voting arrangements outlined in these agreements and his ownership of IAC common stock, Diller controls approximately 63.4% of IAC's voting power.

Edgar Bronfman, Jr., Victor A. Kaufman, Arthur C. Martinez, Steven Rattner, Alan G. Spoon, and Diane Von Furstenberg are directors of IAC. Donald R. Keough, Bryan Lourd, and Gen. H. Nor-

**2.** BDTV Inc. owns 4,000,000 shares of Class B common stock. Liberty indirectly owns more than 99% of the equity and 99% of the voting power of BDTV Inc. Diller owns the remaining stake in BDTV Inc. BDTV II Inc. holds 8 shares of common stock and 15,618,222 shares of Class B common stock. Liberty indirectly owns more than 99% of the equity and 99% of the voting power of BDTV II Inc. Diller owns the remaining stake in BDTV II Inc. BDTV III Inc. holds 8 shares of common stock and 4,005,182 shares of Class B common stock. Liberty indirectly owns more than 99% of the equity and 99% of the voting power of BDTV III Inc. Diller owns the remaining stake in BDTV III Inc. BDTV IV Inc. holds 6 shares of common stock and 800,000 shares of Class B common stock. Liberty Programming holds more than 99% of the equity and 99% of the voting power of BDTV IV Inc. Diller holds the remaining stake in BDTV IV Inc.

**3.** JX 90.

**4.** JX 91.

man Schwarzkopf are IAC directors elected separately by the holders of common stock.

## II.

On November 5, 2007, IAC announced its intention to spin-off certain of its businesses as four newly independent companies (spincos). On January 8, 2008 and January 16, 2008, the IAC board discussed the distribution of one-vote shares in the spincos to the holders of IAC's low-vote common stock and IAC's high-vote common stock (the "single-tier structure"). Using the single-tier structure, Liberty would control approximately 29.9% of the voting power of each of the spincos. However, if a two-tier structure is used, where IAC distributes high-vote shares to the holders of IAC's high-vote Class B common stock and low-vote shares to holders of IAC's low-vote common stock, Liberty would control approximately 61.7% of the voting power of each of the spincos.

On January 22, 2008, IAC and Diller filed Civil Action No. 3486–VCL (the "Diller Action") seeking a declaration that the 2005 Stockholders Agreement, the 2005 Governance Agreement, and the IAC board's fiduciary duties permit implementation of the single-tier structure in the proposed spin-off. On January 24, 2008, Liberty filed Civil Action No. 3491–VCL (the "Liberty Action") seeking primarily injunctive relief and a declaratory judgment that implementation of the single-tier structure in the proposed spin-off violates IAC's charter, the charters of the BDTV Entities, the 2005 Stockholders Agreement, the 2005 Governance Agreement, and the fiduciary duties of the IAC directors.

On January 28, 2008, the Liberty Entities, together with the BDTV Entities, executed and delivered a purported written consent (the "Liberty Consent") to IAC's registered agent in Delaware. The Liberty Consent, if valid, (1) amends IAC's bylaws; (2) removes Diller, Bronfman, Kaufman, Martinez, Spoon, Rattner, and Von Furstenberg from the IAC board; and (3) appoints Maffei, Mark D. Carleton, and William R. Fitzgerald to the IAC board.

Shortly after delivering the Liberty Consent, the Liberty Entities and the BDTV Entities filed Civil Action No. 3501–VCL (the "225 Action") seeking a declaratory judgment (1) that the Liberty Consent amending the bylaws, removing certain IAC directors and appointing the new IAC directors is valid and effective; and (2) authorizing all of the officers, directors, employees, and agents of IAC to take any and all actions necessary or appropriate to carry out the Liberty Consent. Pursuant to the court's ruling on February 1, 2008, the parties negotiated an agreed upon status quo order, which was entered on February 14, 2008. In the status quo order, the parties agreed and the court ordered that the IAC directors in office prior to the delivery of the Liberty Consent would remain in office, subject to certain limitations, and the bylaws in effect prior to the delivery of the Liberty Consent would remain the bylaws of IAC.

Because of the similarity of the claims in the Diller Action, the Liberty Action, and the 225 Action, and for purposes of efficiency, the court consolidated the three actions on February 6, 2008. A five-day trial was held the week of March 10, 2008, and post-trial briefs were submitted by the parties thereafter.

## III.

In order to properly consider the form of agreements at issue here, it is useful to briefly recount the history of the parties' relationship prior to the entry of those agreements.

A. *Silver King And The 1995 Agreement*

The relationship between Liberty and IAC began in 1992. At the time, Liberty was an affiliate of Tele–Communications, Inc. ("TCI"), the country's largest cable-television company. What ultimately became IAC was then called Silver King Communications, Inc., and owned television broadcast stations. In 1992, Liberty obtained an option to purchase 2,000,000 of Silver King's high-vote Class B shares, representing a controlling interest. However, Liberty could not exercise the option because the FCC's cross-ownership regulations barred cable operators from owning broadcast stations located in their cable markets. Therefore, Liberty needed a way to exercise the option without taking control of Silver King.

In 1995, Liberty entered into discussions with Diller with a view toward creating a structure that would permit the exercise of the Silver King option. Ultimately, they agreed that Liberty would create a new entity, Silver Management Company, and contribute to it Liberty's option to purchase Silver King's shares.[5] Diller would hold all the voting stock in Silver Management, and Liberty would hold convertible nonvoting preferred stock in Silver Management. Diller would thus be able to vote the Silver King Class B shares that were to be acquired by exercise of the option, meaning Diller, in effect, controlled Silver King. As the FCC observed in its order approving the arrangement, "Diller [would] own all of the voting stock of Silver Management and [TCI/Liberty would] own almost all of the equity but no voting stock in [Silver Management]."[6]

Liberty and Diller also agreed that Diller would run Silver King, and that, as long as he did so, he would have an irrevocable proxy to vote Silver King shares that Liberty and its affiliates owned or would later come to own. Thus, even were Liberty to convert its nonvoting shares in Silver Management, Diller would still vote all of Liberty's Silver King shares as long as he ran Silver King. The parties memorialized their arrangement in a letter agreement and term sheet dated August 24, 1995 (the "1995 Term Sheet").[7]

Diller's management rights at Silver King were circumscribed in two ways. First, Diller could vote Liberty's Silver King shares only as long he was willing and able to serve as CEO of Silver King and maintained a minimum equity position in Silver King. Second, the 1995 Term Sheet required Diller to obtain Liberty's consent before taking actions constituting "Fundamental Matters." The first of these Fundamental Matters (which ultimately became what is section 2.03(a) of the 2005 Governance Agreement, the contractual provision at the core of this litigation) required Liberty's consent with respect to:

> Any transaction not in the [ordinary course of] business, launching new or additional channels or engaging in any new field of business, in any case, which will result in, or will have a reasonable likelihood of resulting in, [Liberty] or any member of its Stockholder Group being required under law to divest itself of all or any part of its [Silver King securities], or interests therein (including its interest in [Silver Management]), or any other material assets of such entity, or which will render such entity's continued ownership of such stock or assets illegal or subject to the imposition of a fine or penalty or which will impose

---

5. Silver Management was the predecessor to the BDTV Entities of today.

6. IX8 at WLRKIACS12087.

7. JX 4.

material additional restrictions or limitations on such entity's full rights of ownership (including, without limitation, voting) thereof or therein.[8]

The 1995 Term Sheet also required Liberty's consent as to "[t]he acquisition, disposition ... grant or issuance ... by Silver [King] ... of any assets (including debt and/or equity securities), or business (by merger, consolidation or otherwise), or the incurrence of any indebtedness ... with a value of 10% or more of the market value of Silver [King]'s outstanding equity securities at the time of such transaction." [9] The four remaining enumerated Fundamental Matters specifically provided Liberty with consent rights over material amendments to Silver King's charter or bylaws, Silver King's engaging in lines of business other than media, communications, and entertainment, settlement of certain litigation, and large transactions between Silver King and Diller. Notably, the 1995 Term Sheet also granted Diller a right of refusal over Liberty's disposition of its Class B shares.[10]

These arrangements enabled Silver Management (by then renamed BDTV, Inc.) to exercise Liberty's option in Silver King, which it did on August 13, 1996. As provided for in the 1995 Term Sheet, Silver Management/BDTV, Inc. received 2,000,000 shares of Class B common stock, representing 74% of Silver King's voting power. Soon thereafter, Home Shopping Network was merged into Silver King, which then changed its name to HSN, Inc.

B. *The 1997 Seagram–Universal Transaction*

The parties turned the 1995 Term Sheet into more formal contracts in 1997, when HSN entered into a deal with Universal Studios, then owned by Seagram Company, Ltd. In the deal, HSN received Universal's entertainment assets, including USA Networks and Universal Studios' domestic television business. In return, Universal received an ownership interest in HSN. HSN changed its name to USA Networks, Inc. ("USA") when the deal closed in February 1998.

In connection with the transaction, on October 19, 1997, the parties executed documents entitled "Governance Agreement" and "Stockholders Agreement." The 1997 Governance Agreement and 1997 Stockholders Agreement established in more definitive form many of the arrangements set forth in the 1995 Term Sheet.[11] Most importantly, the 1997 Stockholders Agreement memorialized Diller's irrevocable proxy to vote Liberty's shares, although it was now subject to exceptions labeled "Fundamental Changes" rather than "Fundamental Matters." Diller also obtained voting authority over all USA common shares beneficially owned by Universal, again subject to Universal's consent with respect to "any vote for (or consent to approve) any matter that is a Fundamental Change." [12]

The term "Fundamental Change" was defined in the 1997 Governance Agreement to consist of 12 specific actions over which Liberty and Universal had a consent right. The first Fundamental Change in the 1997 Governance Agreement substantially tracked the first Fundamental Matter identified in the 1995 Term Sheet, the provision at the center of this litigation. As noted above, that provision granted

8. *Id.* at 6–7.

9. *Id.* at 7.

10. *Id.* at 10–11.

11. JX 22 (1997 Stockholders Agreement); JX 23 (1997 Governance Agreement).

12. JX 22 at §§ 3.5(a), (b), 3.6(a), (b).

Liberty a consent right over USA's entry into new lines of business circumscribing Liberty's ability to own USA shares.[13] The 1997 Governance Agreement also retained, in substance, the 1995 Term Sheet's language relating to acquisitions, dispositions, and like transactions involving more than 10% of the market value of USA's outstanding equity securities. The 1997 Governance Agreement's 10 remaining enumerated Fundamental Changes granted Universal and Liberty a consent right over, *inter alia:*

- USA's voluntarily commencement of any liquidation, dissolution, or winding up of USA,
- material amendments to USA's charter or bylaws,
- USA's adoption of poison pills,
- USA's engaging in lines of business other than media, communications, and entertainment,
- settlement of certain litigation, and
- large transactions between USA and Diller, Liberty, or Universal.

In addition, the 1997 Stockholders Agreement contained a put/call provision under which Liberty granted to Universal a call right on Liberty's interests, direct and indirect, in USA, exercisable in the event Liberty refused to consent to Fundamental Changes approved by Diller and Universal, or upon Diller ceasing to be the CEO for any reason. Section 4.11 retained Diller's right of first refusal. Under this section, in the event that Liberty chose to sell, transfer, assign, or similarly dispose of its Class B common stock, Liberty had to notify Diller of this intent. Diller would then have 20 days to exchange his low-vote stock for the high-vote Class B common stock.

### C. The 2001–2002 Vivendi Universal Entertainment Transaction

In December 2000, Seagram (Universal's parent) merged with Vivendi and Canal Plus S.A., resulting in the formation of Vivendi Universal S.A. Vivendi Universal then took Universal's place in the 1997 Governance Agreement and the 1997 Stockholders Agreement. A year later, Vivendi and USA decided to drastically alter their relationship. As Diller testified, he was anxious to be rid of Vivendi's influence; Seagram (through Universal) had blocked Diller from pursuing USA's acquisition of NBC, and Vivendi nearly prevented USA's acquisition of Expedia in early 2001. At the same time, Vivendi wished to combine its film studio with USA's television production and distribution arm. To this end, Vivendi and USA agreed to enter into a transaction in which USA would essentially sell its entertainment assets to Vivendi by transferring them to a new partnership called Vivendi Universal Entertainment ("VUE"). In exchange, Vivendi would transfer to USA all of the USA stock it had acquired in its acquisition of Seagram in June 2000. While Vivendi did retain some USA stock after this transaction, it no longer considered USA to be a strategic asset.

---

**13.** *See* JX 23 at § 2.04(i). The section states in full: "(i) Any transaction not in the ordinary course of business, launching new or additional channels or engaging in any new field of business, in any case, which will result in, or will have a reasonable likelihood of resulting in, such Stockholder or any Affiliate thereof being required under law to divest itself of all or any part of its Equity Securities or LLC Shares, or interests therein, or any other material assets of such Person, or which will render such Person's continued ownership of such securities, shares, interests or assets illegal or subject to the imposition of a fine or penalty or which will impose material additional restrictions or limitations on such Person's full rights of ownership (including, without limitation, voting) thereof or therein. . . ."

To effect the transaction, the parties began negotiating an amended and restated governance agreement (the "2001 Governance Agreement") and an amended and restated stockholders agreement (the "2001 Stockholders Agreement"). As part of the negotiations, Vivendi agreed to relinquish its right under the 1997 Stockholders Agreement and the 1997 Governance Agreement to consent to Fundamental Matters. Diller was pleased, but, as he testified, he also hoped to get Liberty to similarly relinquish its consent rights.[14]

As discussed *infra*, after some discussion by their clients, counsel for Diller and Liberty then began to exchange drafts of documents that greatly restricted Liberty's consent rights. After several exchanges of drafts and mark-ups, the parties finally came to an agreement on December 16, 2001. The changes most relevant to this litigation are those related to the "Fundamental Changes" section of the 1997 Governance Agreement, which defined those acts over which Liberty had a consent right pursuant to the 1997 Stockholders Agreement. First, the sec-

tion was renamed "Contingent Matters." Second, the actions constituting "Contingent Matters" were divided into two categories, those in section 2.03(a) and those in 2.03(b). All but one of the Contingent Matters were found in section 2.03(b), and were made subject to a "total debt ratio test." Under this test, the corporate acts enumerated in section 2.03(b) constituted a Contingent Matter over which Liberty had a consent right only if at the time IAC took the action, the ratio of IAC's debt to EBITDA for the fiscal year was 4:1 or greater.[15]

Section 2.03(a), which is the centerpiece of this litigation, defined the remaining Contingent Matter, and was based on the first Fundamental Change from the 1995 Term Sheet and the 1997 Governance Agreement. Unlike Contingent Matters in section 2.03(b), this Matter was not subject to the total debt ratio test. As did the first Fundamental Change in the 1995 and 1997 agreements provided, section 2.03(a) defined as a Contingent Matter USA's entry into a new line of business circumscribing Liberty's right or ability to own USA shares.[16]

14. *See* Trial Transcript (hereinafter "Tr.") 956 (Diller) ("Q. Would you have gone forward with the Vivendi deal without Liberty's commitment to eliminate the veto rights? A. No."); *see also* JX 47 (USA's March 2002 proxy stating that, as a precondition to consummating the VUE transaction, USA "insisted that both Vivendi and Liberty agree to relinquish their veto rights over 'fundamental matters' "); Tr. 98–99 (Malone) ("Q. Now, if Mr. Diller testifies that he had a conversation with you-in which he expressed to you his desire to be free from the fundamental matters restriction, you would not have any basis for contradicting him; correct? A. I think he's an honest man. If he says that's what he remembers, then I'm sure it's true."); Tr. 469 (Bennett) ("Q. Did Mr. Diller or IAC propose any substantive changes to Liberty's consent requirements under the governance arrangements in 2001? A. My recollection is that Mr. Diller's original request was that those rights

be eliminated."); Tr. 628–29 (Kaufman) ("A. ... [B]oth Mr. Diller and I discussed what kind of discussion he should have with Dr. Malone. Because the one thing that was very clear to both of us is that, if we were going to do this transaction, we really couldn't live with the kind of restrictions that we had lived with from 1995 to 2001. That had presented a very significant impediment to growth of the company. Because this was such a favorable transaction, we thought that Dr. Malone would agree to eliminate all of the fundamental matters and let Mr. Diller really have the company to operate. ...").

15. *See* JX 39 § 5.38.

16. JX 39. Section 2.03 states in its entirety:

Section 2.03. CONTINGENT MATTERS. So long as Liberty or Mr. Diller Beneficially Owns, in the case of Liberty, at least 29,-

The 2001 Stockholders Agreement was executed the same day. The put/call provision found in the 1997 Stockholders Agreement was removed, as Universal no longer owned most of the Class B common stock. However, Diller's right of first refusal remained. Together, the 2001 Stockholders Agreement and the 2001 Governance Agreement continued to govern the relationship between USA, Diller, Liberty, and Vivendi until the consummation of the spin-off of Expedia in 2005.

## D. *The 2005 Expedia Spin–Off*

By late 2004, USA had changed its name to InterActiveCorp. and then to IAC/InterActiveCorp. IAC's management proposed to spin off the company's travel businesses,

912,856 Equity Securities (including all Equity Securities held by the BDTV Entities) (so long as such Ownership Percentage equals at least 5% of the Total Equity Securities), or, in the case of Mr. Diller, at least five million Company Common Shares with respect to which he has a pecuniary interest and the CEO Termination Date (as defined in the Amended and Restated Stockholders Agreement and not as defined in this Agreement) has not occurred and Mr. Diller has not become Disabled, neither the Company nor any Subsidiary shall take any of the following actions (any such action, a "CONTINGENT MATTER") without the prior approval of Mr. Diller and/or Liberty, whichever (or both) satisfy the foregoing Beneficial Ownership requirements:

(a) any transaction not in the ordinary course of business, launching new or additional channels or engaging in any new field of business, in any case, that will result in, or will have a reasonable likelihood of resulting in, Liberty or Mr. Diller or any Affiliate thereof being required under law to divest itself of all or any part of its Beneficial Ownership of Company Common Shares, or interests therein, or any other material assets of such Person, or that will render such Person's continued ownership of such securities, shares, interests or assets illegal or subject to the imposition of a fine or penalty or that will impose material additional restrictions or limitations on such Person's full rights of ownership (including, without limitation, voting) thereof or therein. This Contingent Matter will be applied based only on the Beneficial Ownership of Company Common Shares, interests therein or other material assets of Liberty or Mr. Diller or any Affiliate thereof as of the date hereof....

(b) if the Total Debt Ratio continuously equals or exceeds 4:1 over a twelve-month period, then, for so long as the Total Debt Ratio continues to equal or exceed 4:1:(i)

any acquisition or disposition (including pledges), directly or indirectly, by the Company or any of its Subsidiaries of any assets (including debt and/or equity securities) or business (by merger, consolidation or otherwise), the grant or issuance of any debt or equity securities of the Company or any of its Subsidiaries (other than, in the case of any of the foregoing, as contemplated by Section 3.01 of this Agreement), the redemption, repurchase or reacquisition of any debt or equity securities of the Company or any of its Subsidiaries, by the Company or any such Subsidiary, or the incurrence of any indebtedness, or any combination of the foregoing, in any such case, in one transaction or a series of transactions in a six-month period, with a value of 10% or more of the market value of the Total Equity Securities at the time of such transaction ...; (ii) voluntarily commencing any liquidation, dissolution or winding up of the Company or any material Subsidiary; (iii) any material amendments to the Certificate of Incorporation or Bylaws of the Company ...; (iv) engagement by the Company in any line of business other than media, communications and entertainment products, services and programming, and electronic retailing and commerce, or other businesses engaged in by the Company as of the date of determination of the Total Debt Ratio ....; (v) adopting any stockholder rights plan (or any other plan or arrangement that could reasonably be expected to disadvantage any stockholder on the basis of the size or voting power of its shareholding) that would adversely affect Liberty or Mr. Diller; and (vi) entering into any agreement with any holder of Equity Securities in such stockholder's capacity as such, which grants such stockholder approval rights similar in type and magnitude to those set forth in this Section 2.03.

most notably Expedia.com. At a December 14, 2005 board meeting, the IAC board appointed Spoon and Bronfman to a special committee to consider the transaction. According to Malone, some members of IAC management thought the spin-off should be done with one class of stock, but Malone firmly believed it had to involve two classes of stock in order to "honor the agreements" between Diller and Malone.[17] The special committee considered a range of governance structures for the spin-off, including both a two-tier and a single-tier spin-off. As part of that process, the special committee obtained an opinion from its independent counsel at Fried Frank that a single-tier spin-off would not violate either the directors' duties or Diller's proxy.[18]

Ultimately, however, the special committee concluded that the best structure was one replicating IAC's structure—Liberty would receive high-vote stock giving it the largest voting interest in the company, and the shares would (assuming Liberty agreed) be subject to Diller's proxy.[19] The board apparently settled on this structure because Liberty objected to a single-tier spin-off, Expedia wanted Diller involved in managing the company, but Diller would do so only if he had the proxy.[20]

Following the 2005 Expedia spin-off, the parties made amendments to the 2001 Governance Agreement and the 2001 Stockholders Agreement (that are immaterial to this litigation), thereby creating the 2005 Governance Agreement and the 2005 Stockholders Agreement.

E. *The Relationship Deteriorates*

From 2005 on, the IAC–Liberty relationship deteriorated drastically. IAC's stock price fell in 2005. Expedia's stock price dropped between its spin-off as an independent public company and year end. By late 2005, Liberty also made a change in its investment strategy—previously content to be a passive investor, Liberty sought to convert its passive investments into operating assets.[21] Liberty also announced on November 9, 2005 that Maffei would become CEO of Liberty.[22] This represented a significant change in the relationship between Liberty and IAC. Maffei had been Chairman of Expedia at the time IAC acquired its original interest in Expedia, and, according to Malone, negotiations between the two men were "stormy."[23] Diller went so far as to tell Malone that Maffei was a "poor choice" for Liberty's CEO.[24]

As IAC's stock price continued to sag, the relationship between IAC and Liberty grew worse. On February 13, 2006, Malone sent Diller a letter asking for "three changes in our relationship (or IAC structure) which would be greatly helpful in supporting long-term continued investment [by Liberty] in IAC/Expedia and your leadership."[25] The suggested change im-

17. Tr. 15 (Diller).

18. JX 79; Tr. 851–52 (Seymon).

19. JX 88 at 31–32.

20. Tr. 852 (Seymon); Tr. 970 (Diller).

21. Tr. 17–18 (Malone); Bennett Dep. 193–95; Maffei Dep. 173–74.

22. IX 100.

23. Tr. 17–18 (Malone).

24. Tr. 18 (Malone); *see also* Tr. 635 (Kaufman) ("Q. Following the approval of the VUE transaction in 2002, how were relations between Liberty and IAC? A. They were very good. Q. Do you recall when that changed? A. It changed when Mr. Maffei joined Liberty.... When Mr. Maffei joined Liberty, it seemed like everything got much more contentious.").

25. JX 107.

portant to this case was to "[m]odify our agreement to make it clear that Liberty would have the right to vote its shares on any sale of IAC or Expedia."[26] Malone and Diller spoke and, as explained in an email sent after the call, Diller said he "finessed the vote on sale issue by saying I can't imagine I'd do anything to cause [Malone] a taxable event."[27]

Meanwhile, Liberty began looking for ways to reassert control over IAC. For example, the minutes of Liberty's February 10, 2006 board meeting reflect a discussion of "legal issues pertaining to the issue of [Liberty's] right to direct the vote of shares owned by its subsidiaries in IAC."[28] It appears from the evidence that at least some people at Liberty subsequently formed the view that, while Diller voted some of Liberty's shares subject to the proxy in the 2005 Stockholders Agreement, Diller voted a majority of its shares in his capacity as the sole officer of the BDTV Entities. Thus, if, as it eventually did, Liberty converted its non-voting BDTV stock into voting stock, Liberty could remove Diller as CEO and reassert control over its IAC shares.[29] According to the evidence presented at trial, Maffei was the primary advocate of this position;[30] Malone, in both his deposition and at trial, described the theory as "a stupid thing to

litigate," the result of "brain damage," and "[in]consistent with what I'd been saying to the world for ten years."[31] Instead of litigating, Malone said he preferred to try to work with Diller to improve IAC's stock price.[32]

### F. A Way Out: Potential Swaps Discussed In 2007

By the spring of 2007, Diller and Malone were discussing a potential transaction involving the exchange of Liberty's IAC shares for HSN, one of IAC's wholly owned subsidiaries. On March 7, 2007, the IAC board created a special committee to review any proposed transaction. Discussions ended by June 4, 2007, however, because the parties could not reach agreement on the economics of any proposed agreement. IAC's stock price continued to decline.

According to Victor Kaufman, Vice Chairman of IAC and an IAC director, a group of senior IAC executives met at the end of August 2007 to discuss the budget process for calendar year 2008.[33] At the meeting, Kaufman expressed his belief that IAC was at an "inflection point, on a point where we really needed to think through what our strategy was."[34] The other executives agreed. Kaufman gath-

---

26. Id.

27. JX 109. Malone testified at his deposition that the email was substantially accurate. See Malone Dep. 179–80.

28. IX 106 at LMCE004911.

29. JX 120; JX 121.

30. See Tr. 128 (Malone) ("Q. And Mr. Maffei caused a memo to be prepared by Baker Botts reviewing the legal relationship between Liberty and Mr. Diller; correct? A. That's correct."); see also Tr. 558 (Maffei) ("A. ... I tried to hold a position that we had the argument for BDTV, and that we-that it was not inviolate or irrevocable, his proxy.").

31. Tr. 137–38 (Malone); Malone Dep. 204–06.

32. Tr. 136, 150 (Malone).

33. Tr. 641 (Kaufman). This group was referred to as the office of the chairman, or the "OC." Kaufman testified that the OC presently consists of IAC's CFO Tom McInerney, IAC's general counsel Greg Blatt, himself, Doug Lebday, and Diller. See Tr. 620, 680 (Kaufman).

34. Tr. 641 (Kaufman).

ered members of his strategic planning group and financial group together, and set to the task of refocusing IAC's corporate strategy. Kaufman testified that "during this process, I was thinking through where we were competitively, what we were as a conglomerate. It hit me that probably the best thing for us to do would be to separate the company in a significant number of parts."[35] Kaufman soon settled on the idea of spinning off four of IAC's companies. Kaufman also thought about the voting structure such a transaction would encompass.[36] He recognized there were three options: two classes of stock with Diller having a proxy, two classes without a proxy, and a single class of stock.

By September 2007, Kaufman felt the idea of a spin-off was sufficiently well-developed to present the idea to Diller and other senior IAC executives.[37] During those discussions, Kaufman became convinced that a single-tier spin-off was the only viable option.[38] As Kaufman explained at trial, he considered a single-tier spin-off to be the most attractive path to effecting the break-up because it would not require a special committee, and he felt that the spin-off companies would more easily attract business partners were they not controlled by a large stockholder.[39]

At the same time, the evidence suggests at least some senior IAC executives formed a belief that the prospect of a single-tier spin-off might convince Liberty to engage in a swap transaction. In late September 2007, Tom McInerney, IAC's Chief Financial Officer, explained to an associate that "us moving [towards a single-tier spin-off] will force Liberty to strongly consider doing a deal for one or the other...."[40] On September 28, 2007, McInerney sent Diller a script of potential arguments for use in connection with negotiations with Liberty over a swap involving HSN.[41] In the email, McInerney suggests that a potential single-tier spin-off of HSN might pressure Liberty to engage in a swap: "Before, we didn't have a viable HSN spin option—it was either hold HSN or sell it to Liberty.... Now we have a viable spin option and a sale of HSN in a change of control must be compared to that alternative."

Diller testified that he was open to the idea of a break-up using a spin-off, but further testified that he remained unconvinced as to the need for a single-tier spin-off until late 2007.[42] Also, in Diller's view,

---

35. Tr. 642 (Kaufman).

36. Tr. 648 ("A. ... When I originally thought of the idea, it obviously came to me about 'Well, what voting structure do we do?'").

37. Tr. 646 (Kaufman).

38. Tr. 650–51 ("A. ... And as part of that [September] meeting, and as part of a few other subsequent meetings, we discussed the alternative of the two class situation with the proxy in each case.... I strongly recommended that we proceed with a single class.").

39. Tr. 741, 768–69 (Kaufman).

40. LX 85.

41. LX 89.

42. Tr. 651 (Kaufman) ("Q. From his comments, did you understand whether or not Mr. Diller had made up his mind, during this September and October time period, about his views about what the voting structure could or should be at the spin companies? A. No, we had not."); Tr. 653 (Kaufman) ("Q. And was there a discussion at that November board meeting about what members of management thought the voting structure could or should be at the spin-off companies? A. There was no discussion. We had decided that it was really premature.... Mr. Diller still had wanted to have hope that something could be worked out with Liberty."); Tr. 962 (Diller) (stating he had not come to a conclusion by the November 2, 2007 IAC board

the potential spin-off provided no leverage in the swap negotiations.[43] Kaufman testified that he was in agreement with Diller on that point.[44]

## G. *The Wall Street Journal Article*

Events quickened in October 2007. First, Diller called Malone on October 15 and informed him for the first time that IAC management was considering a spin-off. They did not discuss whether such a spin-off would be single- or two-tier. Malone testified that he was generally supportive of the idea.

October was eventful for another reason. Maffei arranged for an October 8, 2007 meeting between Malone and a *Wall Street Journal* reporter. Maffei and the reporter flew on a company plane from New York to Liberty's headquarters in Denver for the interview. Although the parties dispute what Maffei and Malone told the reporter, the end result is indisputable—the October 27 issue of the *Journal* carried a story announcing Diller and Malone's "divorce."[45] Malone was quoted as saying that, while once there had been a market premium attributable to Diller's management, now there was a "Barry discount."

The article ended with references to Maffei's position that Liberty might be able to revoke Diller's proxy, and Maffei's comment that the status of the proxy much depended on whether " 'a bus gets' Mr. Diller."

The article greatly upset Diller. Diller testified that, combined with Malone's previous negative comments about IAC and its management, the article was nothing short of an outright attack on his abilities, and a thinly veiled threat that Liberty would not fairly negotiate a break-up of IAC. More specifically, Diller testified that he thought Liberty was attempting to use the threat of revoking his proxy as leverage in the swap transactions.[46] On October 28, the day after the article came out, Diller emailed Kaufman and said, "[w]hile I don't want to overreact to Malone's proddings, I'm beginning to think we ought to spin one class of stock."[47] Kaufman interpreted the nature of this communication as meaning "verification in [Diller's] mind that [Liberty] had gone over ... a significant line and that the chances of doing ... a transaction beneficial to both parties was becoming highly unlikely."[48]

meeting whether the spin should be single-tier or two-tier).

**43.** Tr. 982–83 (Diller) (explaining that he is not using the spin-off as leverage in swap negotiations, and that he has often rejected Liberty's swap proposals because they did not have appropriate value for Liberty's stockholders).

**44.** Tr. 712–13, 719 (Kaufman) ("Q. You've known all along that a single-tier spin-off plan gives IAC management leverage in swap negotiations; correct? A. I don't believe that. Others may.... In this situation I didn't think that it gave any additional leverage, because I always believed that either a transaction would be done on fair terms to both parties, or the alternative of Liberty being a major shareholder in all of the spun entities,

plus retaining its interest in IAC was a good outcome as well.").

**45.** JX 159.

**46.** Tr. 1074 (Diller) ("A. ... I would say I thought that the chances—you couldn't have produced a worse environment; certainly was not to me the collegial way to—which is what we had always done.... And I thought, wow, this was a very, very bad environment."); Tr. 1075 (Diller) ("A. ... I thought what they were doing clearly was they were saying, 'He is going to have to negotiate with us, and we have leverage over him.' ").

**47.** IX 160.

**48.** Tr. 659.

### H. *November 2 Board Meeting: The Board Approves The Spin–Off In Principle*

IAC's board met on November 2, 2007.[49] At the meeting, IAC management described the background and general contours of the spin-off plan.[50] Allen & Company made a presentation discussing whether the spin-off transaction could be expected to have a positive effect on shareholder value.[51] Although drafts of Allen & Company's presentation circulated in the days before the meeting included references to the spin-off being single-tier,[52] the presentation ultimately made to the board omitted any reference to a specific voting structure for the spin-off companies.[53]

Neither IAC management nor Allen & Company gave the IAC board any indication whether the proposed spin-off would be single-tier or two-tier. Instead, in response to questions, Diller indicated that no determination had been made as to the transaction specifics.[54] After discussion, the board (including Malone and Berkman) unanimously approved the concept of the spin-off, making no decision as to its voting structure.[55] A public announcement followed.[56]

### H. *Malone's December 21 Phone Call To Diller*

On December 21, 2007, Malone called Diller to discuss the proposed spin-off in anticipation of a scheduled January 16, 2008 IAC board meeting. Diller informed Malone that IAC management was intending to recommend a single class of stock for the spin-off companies. Diller recounted the conversation in an email to Kaufman shortly afterwards:

> I just had a lengthy conversation with John Malone. He asked if we should have discussions prior to the Board meeting on the 16th. I said we could of course if there were something to discuss—I then told him that we were planning on simple spins, one class of stock. He paused and then said ["]well, that's OK, providing we didn't preclude them from either Board representation in proportion to their ownership or their ability to purchase stock since they didn't want a situation that might cause them future tax liability.["] I said ["]we haven't finalized our thinking on those issues, but that we would have protections against any potential disadvantage to all shareholders, and that I hadn't thought about Board representation for Liberty but my initial feeling was that I didn't see any reason why it would be in all shareholders interest for Liberty Board representation["]—to which he responded that ["]then we'd probably have a messy proxy fight on our hands.["] I said ["]I couldn't care less what he did[."]

We then had a rather unpleasant discussion of his and Greg Maffei's comments in the media—to which he said that his statements were meant to underlay his 'happiness' with the IAC investments and their prospects for the future. I told him that we would be fair and equitable, and we would never act punitively, but he had lost me and if he were asking

---

49. IX 165 (minutes of meeting).

50. *Id.* at IACS00015413.

51. JX 162; IX 165.

52. LX 106 at 2; LX 109; LX 116 at 3; LX 118–19; LX 121 at 3; LX 211.

53. JX 162.

54. IX 165 at IACS00015414.

55. *Id.* at IACS00015415.

56. JX 167.

for favorable or special treatment it wouldn't be recommended by me....[57]

Malone testified that Diller's email summary was in large part accurate, and added that the December 21 call was the first time he learned that IAC management intended to recommend a single-tier spin-off.[58] Malone further testified that his initial reaction to the news was that Diller wanted to obtain control of IAC and its assets through a swap,[59] and was "attempting to improve his leverage with respect to some kind of a redemptive negotiation,"[60] a clear reference to Diller's right of first refusal.

## I. *Legg Mason And The Poison Pill*

IAC management continued to plan for the spin-off until early January. At some point after January 1, 2008, representatives of Legg Mason Capital Management approached Allen & Company about the potential sale of Legg Mason's 30 million share block of IAC stock (worth approximately $700 million at IAC's then-current market price) representing 13% of IAC's equity. Allen & Company first contacted IAC. IAC replied that it was not interested. Allen & Company then contacted Liberty, which did express interest.

Malone testified that he was interested in the Legg Mason block because it would increase his share of control in the spincos; if Liberty purchased the entire Legg Mason block, it would have 38.5% of the votes at the spin-off companies, assuming a single class of shares.

Diller quickly learned of Liberty's interest. Realizing that such a purchase could deprive IAC of the ability to spin off the companies free of Liberty's influence, Diller took action, scheduling a special telephonic meeting of the board for January 8, 2008. The purpose of this meeting was to consider the adoption of a shareholder rights plan or "poison pill" to prevent Liberty from purchasing the Legg Mason shares without IAC board approval.[61]

At the meeting, Malone read a prepared statement opposing the adoption of a poison pill, and expressed Liberty's view that a single-tier spin-off would violate the directors' duties, as well as the 2005 Governance Agreement and 2005 Stockholders Agreement. He made no reference to section 2.03(a), stating only that Liberty believed the single-tier spin-off proposal would "violate multiple duties owed to Liberty by IAC, its board of directors, and Mr. Diller. The letter and spirit of the governance arrangement in place with respect to IAC is that Barry would be the

---

**57.** IX 171.

**58.** Tr. 37 (Malone).

**59.** Tr. 57 (Malone).

**60.** Tr. 41 (Malone).

**61.** Diller testified that he wanted to prevent Liberty from increasing its share of control in the spincos until the companies had time to grow "their little sea legs." Tr. 1082, 1153–54 (Diller) (stating "[w]e wanted to achieve one thing. We wanted to achieve those companies being able to be independent for a period of time, where they could get going."); Tr. 658 (Kaufman) (stating "we were con-cerned that if we proceeded with the ... spins, that those entities—without these protections, that those entities would be put in the position of potentially having significant activity in terms of taking over the company immediately. And we believed that those companies needed some significant breathing room in order to evolve."). Diller also testified that it would be bad for the spincos were Maffei to control them by voting Liberty's shares. *See* Tr. 1047 (Diller) ("Q. Did you say at your deposition that Greg Maffei having influence on IAC would be 'very bad for IAC.' A. I don't know how it could be good, sir....").

steward of our controlling interest."[62]

Ultimately, the IAC board agreed to table the poison pill proposal to permit additional discussions. Within two days, Diller proposed and Liberty agreed to enter into a standstill agreement providing that Liberty would purchase 14 million shares of Legg Mason and IAC would purchase 6 million, bringing Liberty up to a 29.9% interest in IAC. Liberty further agreed this ceiling would remain in place until the earlier of the date the spin-off was completed or April 15, 2009.

### J. The January 16 Board Meeting

IAC's board met again in New York City on January 16, 2008. In an email circulated in the days before the meeting, Diller told the IAC directors that the meeting was "an informational meeting and no votes are planned to be taken on material matters."[63] Kaufman similarly testified that the purpose of the meeting was "reviewing with the board where we stood with respect to the spin ... giving them a progress report on capital structure, what kind of debt we were putting on each entity, what our thoughts were in terms of management, and other things that related to ... structure."[64] According to Kaufman, IAC management intended to hold additional meetings at which the board would actually vote on the transaction.

Upon receiving notice, Malone called Diller and arranged to meet informally before the board meeting. Before the January 16 board meeting began, Kaufman, Diller, and Malone spoke in a conference room for approximately one hour. Malone proposed a swap transaction that would unwind the Liberty/IAC relationship, with Liberty receiving IAC's Interval time-share business and cash in exchange for its IAC stake. Malone gave the IAC representatives a written analysis of the value of IAC shares and IAC's businesses, in support of Liberty's proposed asset swap terms. The three men adjourned without making a deal.

During the board meeting, Diller summarized his conversation with Malone and Kaufman by saying that it was apparent there would be either a negotiated separation of Liberty and IAC, an agreement on the structure of the spin-off through further discussions, or a resolution through litigation. Diller stated to the board that he thought Malone would agree with this description of the import of their conversation, and Malone did not state any disagreement.[65]

Diller also stated that he wished to read a presentation in response to the statement read by Malone the previous week.[66] Diller's statement advocated a single-tier spin-off, and cited four reasons why it was preferable to a two-tier spin-off.[67]

---

62. JX 176 at BBE—0002001.

63. JX 179.

64. Tr. 662–63 (Kaufman).

65. JX 185 at IACS12145.

66. Id.

67. First, according to Diller, "multiple individuals [had] expressed serious reservations about serving, and in certain cases an absolute unwillingness to serve, in a senior capacity" if IAC's dual class structure were replicat-

ed in the spin-off "without my having the proxy." Second, according to Diller, certain strategic partnerships were not possible with a high-vote structure and "certain existing strategic partners at Ticketmaster [had] expressed serious reservations about expanding their relationship if the spincos were to become Liberty controlled entities." Third, "potential merger partners would be wary of receiving stock in a company with Liberty as a control[ling] stockholder...." Fourth, if Liberty were the controlling stockholder, Liberty's other strategic interests "would undermine our objective of allowing each of the

IAC's counsel, Martin Lipton, then read prepared remarks indicating that the board members would not breach their fiduciary duties by voting in favor of the single-tier spin-off. Neither Diller's nor Lipton's remarks discussed the fairness of the transaction to IAC's Class B common stock, and Malone and Kaufman testified that no such discussion took place.[68] However, Kaufman testified that the board was not presented with a definitive form of a spin-off proposal.[69]

The evidence about what happened next is somewhat conflicting, but a clear perspective emerges. Malone asked whether the spin-off would be subject to a stockholder vote. According to Malone's testimony, Diller unequivocally responded that there would be a stockholder vote, and that he would vote Liberty's shares in favor of the single-tier spin-off. Berkman testified that Diller's initial statement about the shareholder vote was conditional. However, according to Berkman, Diller's statement of intent to hold a vote and vote Liberty's shares was unequivocal by the end of the meeting.

The board minutes evince a much more contingent statement by Diller: "Mr. Diller and Mr. Lipton responded that they were still thinking about the subject of a stockholder vote, and Mr. Diller added that the inclination is to have a stockholder vote."[70] Numerous witnesses support this account, testifying that no decisions were made at the board meeting, and that Diller merely stated that "if" there was a stockholder vote, he would vote Liberty's shares.[71]

Regardless of what Diller actually said, it is uncontested that Berkman and Malone were then asked to excuse themselves from the meeting. The board continued to discuss the form and time-line of the spin-off,[72] but ultimately took no vote and made no final decisions. Berkman testified that after the meeting, Malone and Diller discussed yet another potential deal but did not reach agreement.[73] That afternoon, Diller and Malone met again at the airport, each expressing a hope that the parties could resolve the issue with a negotiated deal, and then parted ways.

## IV.

Before turning to the merits, the court must first address the parties' positions that certain aspects of the dispute are not ripe. Briefly, the IAC parties argue that the claims of breach of fiduciary duty are unripe, essentially because the IAC board has only given its general (and unanimous) approval to the concept of the spin-off, but has not considered or acted on any of the final details of that plan. Most importantly, the IAC board has not made any decision about the voting structure of the spincos, i.e. whether or not their capital

spincos to pursue its own strategic course...." *Id.*

68. Tr. 54 (Malone); Tr. 732–33 (Kaufman).

69. Tr. 673–74 (Kaufman).

70. JX 185 at WLRKIACS00012145.

71. Tr. 668 (Kaufman); Tr. 864 (Seymon).

72. IX 233 at IACS00025329 (presentation to board setting out time-line for doing the spins).

73. Tr. 216 (Malone) ("Q. At this point, you walk out of this January 16th meeting, and you start talking deal again. Right? A. I was always thinking deal."); Tr. 262–63 (Berkman) ("Q. Mr. Diller comes out? A. Correct. He comes to the room where Doctor Malone and I are sitting, waiting for him. Q. And they start talking deal? A. ... Doctor Malone suggested a bunch of different approaches.").

structure will mirror IAC's two-tier voting structure or, as IAC management prefers, will not. At the same time, the IAC parties argue that all of the contract and charter interpretative issues are ripe for decision, as there is obvious adversity of interests and no facts remain to be developed. Thus, they ask the court to resolve all of Liberty's contractual claims. Liberty has belatedly come to agree that the fiduciary duty claims are unripe and also now urges the court to refrain from deciding *any* of the contract claims it included in its complaints and argued in its briefs. Liberty argues that because no final spin-off has been approved, it is premature to consider any of those claims.

 There is no doubt that the 225 Action is ripe for decision. As a result of Liberty's execution and delivery of the Liberty Consent on January 28, 2008, there is a concrete dispute about the content of IAC's bylaws and the composition of its board of directors. The issues raised in that dispute are, therefore, both fit for review and ones the court has a positive duty to decide.[74] Central to Liberty's claims in the 225 Action is Liberty's interpretation of section 2.03(a) of the 2005 Governance Agreement as giving it a right of consent to any single-tier spin-off. If that interpretation is wrong, the proxy remains in effect and the purported written consents are nullities. This is so because, if Liberty is wrong about section 2.03(a), Liberty has no plausible basis to claim that Diller has repudiated his obligations under the 2005 Stockholders Agreement or the 2005 Governance Agreement. For these reasons, the court will rule on the proper construction of section 2.03(a).

The court will also rule on Liberty's arguments that section 5.1 of the 2005 Stockholders Agreement (prohibiting certain actions by the BDTV Entities without Liberty's consent) and certain provisions of the IAC and BDTV certificates of incorporation provide additional grounds on which to object to a single-tier spin-off. These matters were the subject of testimony at trial, are fully briefed, and are not subject to any future developments. In the circumstances, while these issues depend, in a logical sense, on a future decision to authorize a single-tier spin-off, they are obviously in dispute, were the subject of testimony at trial and briefing, and can be fully and fairly analyzed on the existing record. These issues are therefore fit for review and are ones the court feels duty-bound to decide in the interest of judicial economy.

 The fiduciary duty claims relating to the spin-off, in contrast, are unripe for decision, as all parties now appear to recognize. As the Delaware Supreme Court observed in *Stroud v. Milliken Enterprises Inc.*, "[w]henever a court examines a matter where facts are not fully developed, it runs the risk not only of granting an incorrect judgment, but also of taking an inappropriate or premature step in the development of the law."[75] In this case, there has been no final decision made by the IAC board to do a single-tier spin-off. While there is, of course, a sufficient likelihood a single-tier spin-off will happen to justify the court's decision to adjudicate the related contractual or charter-based

---

**74.** The factors influencing a court's determination of ripeness were discussed at length in *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740–41 (Del.Ch.2006). In general, a court assessing the ripeness of a claim should consider both whether it is "fit" for review, *i.e.*, it is not dependent on uncertain and contingent events that may or may not occur, and whether withholding a decision would create hardship for the parties.

**75.** 552 A.2d 476, 480 (Del.1989).

issues, the analysis of the fiduciary duty claims are contextual in nature and will depend on a factual record that has yet to be developed.

In this regard, the court notes that no blackletter rule of law or equity is involved that might otherwise cause the court to consider the fiduciary duty issues ripe for decision.[76] Liberty points to the venerable authority of *Condec Corporation v. Lunkenheimer Company*[77] and *Canada Southern Oils Limited v. Manabi Exploration Company*,[78] to argue that "where the purpose and effect of the directors' action is to deprive a stockholder of voting control, the transaction is *per se* inequitable...."[79] The difficulty in relying on these and like cases is that Diller, not Liberty, currently exercises majority voting power; Diller, not Liberty, will see his power diminished as a result of a single-tier spin-off; and Diller is evidently in favor of such action. While it is true that Liberty would not gain majority voting control of the spincos as a result of a single-tier spin-off, it would obtain a present ability to exercise very substantial voting power in each one of them. In the circumstances, the fiduciary duty issues raised in these law suits lack the characteristic *per se* illegality of the claims in *Condec* and *Canada Southern Oils*. Instead, questions of whether the

IAC directors properly discharge their fiduciary duties to all IAC stockholders, including Liberty as the owner of the Class B stock, can only be judged after the directors take action.

## V.

Liberty, as the plaintiff in the 225 Action, bears the burden of proving by a preponderance of the evidence that it is entitled to relief.[80] In considering the plaintiff's claims, "the relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact."[81]

### A. Section 2.03(a) Is Unambiguously A Regulatory Provision

Liberty relies most heavily on section 2.03(a) in arguing for a right to consent to a single-tier spin-off.[82] The court will first analyze that provision's plain meaning.

■ The 2005 Governance Agreement grants Liberty certain consent rights with respect to Contingent Matters.[83] Section 2.03 defines Contingent Matters in two subsections, 2.03(a) and 2.03(b). The items defined in section 2.03(b) are only triggered in the event IAC's "[t]otal [d]ebt

---

**76.** *Bebchuk*, 902 A.2d at 742 (stating that "[i]f the bylaw in question ... was obviously invalid, the court might be more likely to act now") (citing *Diceon Elec., Inc. v. Calvary P'ners, L.P.*, 1990 WL 237089, *2 n. 3 (Del.Ch. Dec. 27, 1990)).

**77.** 230 A.2d 769 (Del.Ch.1967).

**78.** 96 A.2d 810, 813–14 (Del.Ch.1953).

**79.** Pretrial Brief of Liberty Media Corp. and the IAC Majority Stockholders (hereinafter "Pls.' Pre–Trial Br.") 45.

**80.** *See BioLife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 276 (Del.Ch.2003) (citations omitted); *Interim Health Care v. Fourni-*

*er*, 1994 WL 89007, at *5 (Del.Ch. Feb. 28, 1994).

**81.** *Interim Health Care*, 1994 WL 89007, at *5; *see also BioLife Solutions*, 838 A.2d at 276–77 (stating "[a] trial court may determine the weight and credibility to be accorded any witness, and has responsibility for resolving conflicts in the evidence") (citations omitted).

**82.** The full text of section 2.03 is set out at note 16, *supra*.

**83.** Section 2.03 conditions this consent right on certain ownership requirements, which are not the subject of dispute in this action. *See* JX 90.

[r]atio continuously equals or exceeds 4:1 over a twelve-month period." The parties agree that IAC has not fallen below this debt ratio and, therefore, the protections afforded to Liberty under section 2.03(b) are unavailable. Rather, the current dispute focuses on whether Liberty's consent is necessary with respect to the proposed spin-off under section 2.03(a).

According to Liberty, a single-tier spin-off is a Contingent Matter under section 2.03(a) because it is a transaction outside the ordinary course of business "that will impose material additional restrictions or limitations on [its] full rights of ownership" in its IAC common shares. Liberty argues that the phrase "full rights of ownership" is "unambiguous and plainly includes (i) voting rights and powers accompanying [its] ownership of the IAC securities, and (ii) the economic benefits of owning the IAC securities or the interest in IAC's assets represented thereby."[84] Thus, Liberty argues, as the holder of 61.7% of the voting stock of IAC, the proposed spin-off will limit its "full rights of ownership" in those shares by "stripping out 70% of IAC's assets."[85] Alternatively, Liberty argues that its controlling stake in IAC represents a property interest that will be devalued by the single-tier spin-off because Liberty will no longer have the majority voting power over those entities.

IAC responds that the plain meaning of section 2.03(a) demonstrates that the proposed spin-off is not a Contingent Matter and that section 2.03(a) pertains solely to regulatory matters. According to IAC, the spin-off does not "impose" any "restrictions or limitations" on Liberty's "rights of ownership" because Liberty will own the same IAC common shares and other assets after the spin-off. IAC contends that Liberty misunderstands the principle that " '[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets.' "[86] Therefore, IAC asserts that section 2.03(a) cannot cover Liberty's purported interest in the assets of IAC.[87] To further undermine Liberty's position, IAC cites "the very words of [section] 2.03(a)" which "address only impacts on the ownership rights of Diller, *Liberty* and their Affiliates in their respective assets or IAC shares."[88]

This court's analysis of section 2.03(a) is guided by the "elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract."[89] In reviewing the Governance Agreement, this court will give the terms their "common or ordinary meaning."[90] Importantly, "[c]ontract terms are not ambiguous merely because the parties to the contract disagree; rather, the court 'stand[s] in the shoes of an objectively reasonable third-party observ-

---

84. Pls.' Pre–Trial Br. 69.

85. *Id.*

86. Pretrial Brief of the IAC Parties (hereinafter "Defs.' Pre–Trial Br.") 42 (quoting *Dole Food Co. v. Patrickson,* 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003)).

87. As discussed further below, IAC contends that section 2.03(a) would protect Liberty from "the imposition of a restriction on how Liberty can hold its stock (*e.g.*, a voting trust), or on Liberty's right to vote its IAC shares in

certain ways or on certain issues...." *Id.* at 43.

88. *Id.* at 44 (emphasis in original).

89. *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del.1992).

90. *Cove on Herring Creek Homeowners' Ass'n v. Riggs,* 2005 WL 1252399, at *1 (Del.Ch. May 19, 2005) (quoting *NBC Universal, Inc. v. Paxson Commc'ns Corp.,* 2005 WL 1038997, at *9 (Del.Ch. Apr. 29, 2005)).

er,' and ascertains whether the contract language is unmistakably clear."[91]

As both parties agree, section 2.03(a) only applies in the event of "any transaction not in the ordinary course of business, launching new or additional channels or engaging in any new field of business" that is likely to result in certain adverse consequences to either Liberty or Diller, defined as:

> ■ being required under law to divest itself of all or any part of its Beneficial Ownership of Company Common shares, or interests therein, or any other material assets ...; [2] or that will render such Person's continued ownership of such securities, shares, interests or assets illegal or subject to the imposition of a fine or penalty ...; [3] or that will impose material additional restrictions or limitations on such Person's full rights of ownership (including, without limitation, voting) thereof or therein.[92]

The parties do not dispute the scope of clauses [1] or [2].[93] The use of the words "divest," "illegal," and "fine or penalty" make clear that these clauses trigger Liberty's consent right where a transaction subjects Liberty to possible regulatory restrictions or sanctions.

The dispute centers on the scope of clause [3] (the "Third Clause"). Liberty contends that this clause is not limited to regulatory matters and creates an "open-ended catch-all which, on its face, prevents Diller or IAC from depriving Liberty of the voting or economic attributes of its controlling position in IAC."[94] More specifically, Liberty argues that the single-tier spin-off is a Contingent Matter within the scope of the Third Clause because it imposes "material additional ... limitations on Liberty's full rights of ownership" because of its "dilutive and value destroying effects" on Liberty's interest in IAC.[95]

IAC responds that Liberty's position is inconsistent with the internal structure of section 2.03(a) and the overall structure of the 2005 Governance Agreement. According to IAC, all three clauses relate exclusively to regulatory matters. With respect to the internal structure of section 2.03(a), IAC contends that, applying the canon of construction known as *ejusdem generis*, the Third Clause must be read as pertaining to the same regulatory subject evident in the first two clauses.[96] Liberty counters that *ejusdem generis* only applies where there is an ambiguity and, here, the parties agree that the Third Clause is not ambiguous.

■ This dispute centers on the uncertain scope of that clause, which makes the application of *ejusdem generis* permissible.[97] The canon of *ejusdem generis* provides:

> [W]here general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be

---

91. *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del.Ch. Nov. 8, 2007) (quoting *Dittrick v. Chalfant*, 2007 WL 1039548, at *4 (Del.Ch. Apr. 4, 2007)).

92. JX 90.

93. *See* Defs.' Pre–Trial Br. 45; *see also* Pls.' Pre–Trial Br. 71 ("[W]hile the first two provisions do make reference to actions required by law, the third provision, which is at issue here, includes no such reference.").

94. Pls.' Pre–Trial Br. 71.

95. *Id.* at 69–70.

96. Defs.' Pre–Trial Br. 45.

97. *See Harrison v. PPG Indust., Inc.*, 446 U.S. 578, 588, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980).

construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.[98]

*Ejusdem generis* may be "used to determine whether a phrase is ambiguous" and, thus, does not depend on a finding of ambiguity.[99] While it is true that rules of construction, such as *ejusdem generis*, should not be unnecessarily applied,[100] in this case it properly serves to elucidate the intent of the parties in drafting section 2.03(a).[101] The clear regulatory scope of

clauses [1] and [2] requires the court to read the general language of the Third Clause as being related to the same subject matter.

■■■ Under another general rule of construction, specific words limit the "meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."[102] The Third Clause contains more general terms (i.e., "full rights

---

**98.** *Aspen Advisors LLC v. United Artists Theatre Co.,* 861 A.2d 1251, 1265 (Del.2004) (quoting *Petition of State,* 708 A.2d 983, 988 (Del.1998)).

**99.** *New Castle Co. v. Nat'l Union Fire Ins. Co.,* 243 F.3d 744, 752 n. 6 (3d Cir.2001). Liberty also argues that "Delaware courts have consistently invoked *ejusdem generis* only where the general language refers expressly to the specific language, typically through words such as 'otherwise' or 'other.'" Post–Trial Brief of Liberty Media Corp. and the IAC Majority Stockholders (hereinafter "Pls.' Post–Trial Br.") 26–27. While *ejusdem generis* can generally be more readily applied when the words "otherwise" or "other" are present, the Third Clause clearly flows from the first two restrictions. If the Third Clause was truly as unrelated as Liberty claims, the parties would not have employed the word "additional" to introduce it or used the words "thereof or therein" that plainly refer back to the two preceding provisions. This reading is consistent with the Liberty understanding of the inter-relation of the provisions in section 2.03(a). As Liberty stated:

> Nor is there any dispute that the protective feature of Section 2.03(a) applies to "restrictions or limitations" applicable to "Beneficial Ownership of Company Common Shares [defined as the IAC Class A and Class B common stock], or interests therein, or any material assets of such Person"— the antecedent of the defining clause "thereof or therein."

Pls.' Pre–Trial Br. 69. Lastly, Liberty argues that the Third Clause should not be read as limited to regulatory actions because of the "commas and 'or's' separating each of the three distinct provisions." Pls.' Post–Trial

Br. 27. According to Liberty the canons of construction, which "'indicate that terms connected [by] the disjunctive ['or'] be given separate meanings,'" precludes IAC's reading. Pls.' Post–Trial Br. at 27–28 (quoting *Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). This argument ignores IAC's contention, discussed below, that the Third Clause in section 2.03(a) does have a separate meaning, but that it is one specific to regulatory matters.

**100.** *See generally State ex. rel. Waldman v. Miller–Wohl Co.,* 28 A.2d 148, 152 (Del.Super.1942).

**101.** *Cf. White v. Crowley,* 1986 WL 5850, at *2 (Del.Super. May 8, 1986) ("As with all rules of statutory construction, [*ejusdem generis*] does not apply when the context shows a contrary intention. In other words, the goal of statutory construction is to find the intent of the legislature, and rules of statutory construction are merely means toward that end."). Confining the Third Clause to the regulatory subject evidenced in the first two provisions of section 2.03(a) is also consistent with the general rule of construction that specific words limit the "meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." *See* 11 Williston on Contracts § 32:10 (4th ed.). As will be discussed further below, the whole agreement, and in particular the other provisions in section 2.03, supports IAC's more limited reading of the Third Clause.

**102.** *See* 11 Williston On Contracts § 32:10 (4th ed. 1999).

of ownership") than either clause [1] or clause [2] (referring to divestiture, fines, penalties, etc.). It is thus appropriate that the Third Clause be confined to the regulatory subject evidenced in the first two provisions of section 2.03(a).

Further support for the conclusion that section 2.03(a) is entirely regulatory in purpose is found in the final sentence of section 2.03(a), providing "[t]his Contingent Matter will be applied based only on the Beneficial Ownership of Company Common Shares, interests therein or other material assets of Liberty ... as of the date hereof."[103] This restriction evinces the regulatory scope of all of section 2.03(a) because it is intended to prevent Liberty from expanding its right to consent to transactions acquiring additional shares *or other assets.* Such a limitation is clearly grounded in regulatory concerns. IAC, aware that the scope of the consent right could change as Liberty's business changed, sought to limit section 2.03(a) to the composition of Liberty's assets at the time of the agreement. IAC's reading is also supported by the use of the word "restrictions" in the Third Clause. This term, particularly when read in the context of the first two provisions, is objectively understood as pertaining to regulatory matters, as the word is commonly invoked to characterize government oversight.

For all of these reasons, Liberty's overly broad interpretation that the Third Clause is a sweeping "catch-all" intended to preserve its "full rights of ownership" is contrary to the plain meaning of section 2.03(a). The only sensible conclusion is that the Third Clause unambiguously applies solely to regulatory matters.

Moreover, the Third Clause, while more generally worded, cannot be read as a regulatory "catch-all." As noted by IAC, it is tailored to a method of regulatory sanctions not covered in the first two restrictions. When properly read as a regulatory provision, the "full rights of ownership" language in the Third Clause contemplates government actions restricting Liberty's voting rights or other rights that inhere in the share ownership. Indeed, the attendant language stating the Third Clause applies to "without limitation, voting," reinforces this conclusion.

**B. *Section 2.03(b) Confirms Section 2.03(a) Is A Regulatory Provision***

▮ The presence of section 2.03(b) in the Governance Agreement also confirm IAC's regulatory reading of the Third Clause. It is a general rule of contract construction to "consider the entire instrument and attempt to reconcile all of its provisions 'in order to determine the meaning intended to be given to any portion of it.' "[104] "Delaware courts do prefer to interpret contracts to give effect to each term rather than to construe them in a way that renders some terms repetitive or mere surplusage."[105]

Section 2.03(b), the alternative Contingent Matter provision, is particularly instructive in ascertaining the meaning of the Third Clause. Section 2.03(b)(i) grants Liberty a consent right, "if the Total Debt Ratio continuously equals or exceeds 4:1 over a twelve-month period, then, for so long as the Total Debt Ratio continues to equal or exceed 4:1," over:

103. JX 90.

104. *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 937 (Del.1979) (quoting *Ellingwood v. Wolf's Head Oil Refining Co.,* 38 A.2d 743, 747 (Del.1944)).

105. *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC,* 2007 WL 3317551, at *11 (Del.Ch. Nov. 2, 2007).

(i) any acquisition or disposition (including pledges), directly or indirectly, by the Company or any of its Subsidiaries of any assets (including debt and/or equity securities) or business (by merger, consolidation or otherwise), the grant or issuance of any debt or equity securities of the Company or any of its Subsidiaries ... with a value of 10% or more of the market value of the Total Equity Securities at the time of such transaction ...;

As IAC asserts, this subsection undermines Liberty's expansive reading of section 2.03(a). Foremost, subpart (b)(i) squarely addresses transactions such as the proposed single-tier spin-off and grants Liberty a consent right only if IAC falls below the 4:1 total debt ratio. The spin-off contemplated involves the disposition of IAC assets and the issuance of equity securities with a value of well over 10% of IAC's market value. This makes clear that the parties, in drafting the 2005 Governance Agreement, contemplated a transaction substantially similar to the proposed spin-off and chose to condition Liberty's consent right in connection with such a transaction on IAC falling below the debt ratio hurdle.

While Liberty admits that sections 2.03(a) and 2.03(b)(i) overlap, it contends that this "does not permit the Court to read the overlapping provision out of existence. Nor does that overlap compel the Court to interpret the provisions narrowly in an attempt to avoid the overlap."[106] According to Liberty, sections 2.03(a) and 2.03(b)(i) are not inconsistent. Rather, the proper reading is that under a transaction such as the proposed spin-off, "Liberty's consent right would simply flow from multiple sources."[107]

In support of its position, Liberty cites no controlling Delaware case law and the cases it relies upon fail to support its argument.[108] Generally, the cases stand for the proposition that, despite the preferred interpretive principle to give all terms a "reasonable, lawful, and effective meaning," some "redundancy" is acceptable and may not render an overlapping provision meaningless.[109] For example, in *In re BankVest Capital Corp.*,[110] a case

---

**106.** Pls.' Pre–Trial Br. 72.

**107.** *Id.* 73.

**108.** *See id.* at 72 (citing *Morgenbesser v. Aquarion Water Co.*, 276 Conn. 825, 888 A.2d 1078, 1082 (2006); *RPC Liquidation v. Iowa Dept. of Transp.*, 717 N.W.2d 317, 325 (Iowa 2006); *In re BankVest Capital Corp.*, 360 F.3d 291, 301 (1st Cir.2004)).

**109.** In *Morgenbesser*, a case involving a dispute concerning the application of a restrictive covenant barring the installation of a wireless telecommunications facility, the court held, that while it held in an earlier decision that the terms "accessory" and "incidental" overlapped in meaning to "some degree," this did not mean that the words are "completely synonymous or that they cannot be used disjunctively in a contractual context unless they are given entirely different meanings." 888 A.2d at 1082. Thus, the court gave effect to the term "incidental" because it was not superfluous. In addition, the court found that, even if the words were redundant, "that result would be preferable to an interpretation that would require us to give a meaning to the word 'incidental' that it clearly was not intended to have." *Id.* In *RPC*, a case involving an alleged breach of contract by the Iowa Department of Transportation, the court found that "some 'mild redundancy' " in the controlling contract did not affect the terms of the contract because it was done to specifically ensure that subcontractors could not sue as third-party beneficiaries. The contract also included a provision stating "[n]othing in any special provision or any supplemental specification shall be construed as eliminating or superseding the requirements of this section." 717 N.W.2d at 324.

**110.** 360 F.3d 291.

involving a statutory interpretation of the Bankruptcy Code, the court concluded that the relevant statute was ambiguous. Significant to this case, the court distinguished the effect of redundancies and surplusage, indicating that while some redundancy is acceptable, extensive surplusage is not.[111] Liberty characterizes the overlap between section 2.03(a) and section 2.03(b)(i) as an acceptable redundancy, arguing:

> [E]ach provision establishes an independent consent right, which may or may not be triggered in any given transaction depending on the terms of the transaction and IAC's leverage. For example, if IAC's Total Debt Ratio triggered the provisions of 2.03(b), subsection (1) of 2.03(b) would prohibit IAC from consummating a dual-class spin-off without Liberty's consent. Absent the applicability of Section 2.03(b) due to the debt ratio test, Section 2.03(a) would not prohibit that dual-class spin-off since the transaction would not impose material additional restrictions or limitations on Liberty's full rights of ownership.[112]

Unlike the relatively minor redundancies involved in the cases cited, Liberty's reading injects a broad surplusage that goes to a key aspect of the 2005 Governance Agreement. It is nearly inconceivable that the parties specifically contemplated IAC issuing stock, in a manner similar to the proposed spin-off, in section 2.03(b)(i) and

then broadly addressed the same scenario in general terms in section 2.03(a) among several regulatory provisions. This represents not a mere redundancy, but a glaring inconsistency that cannot be reconciled under Liberty's reading.

Liberty's broad reading of the Third Clause would also make other provisions in section 2.03(b) superfluous. For example, section 2.03(b)(v)[113] precludes IAC from "adopting any stockholder rights plan ... that would adversely affect Liberty" without Liberty's consent, if the debt ratio is triggered. This would presumably be covered by the Third Clause in section 2.03(a). Liberty's understanding of the term "full rights of ownership" would encompass a stockholder rights plan that would "adversely affect Liberty." Similarly, sections 2.03(b)(ii) and (iv)[114] would also be rendered duplicative in light of Liberty's overly generous reading of the Third Clause. These subsections, which contemplate any dissolution of IAC or one of its subsidiaries and IAC granting similar stockholder approval rights to another person, also address circumstances that Liberty would presumably consider as limiting its "full rights of ownership."

## VI.

The court will, for the sake of completeness, also consider the parol evidence concerning the parties' understanding of section 2.03(a) that was adduced at trial.

**111.** *See id.* at 302 ("There may be substantial overlap among the provisions ... but redundancy is not the same as surplusage.").

**112.** Pls.' Pre–Trial Br. 73.

**113.** Section 2.03(b)(v) reads: "adopting any stockholder rights plan (or any other plan or arrangement that could reasonably be expected to disadvantage any stockholder on the basis of the size or voting power of its shareholding) that would adversely affect Liberty or Mr. Diller ...."

**114.** Sections 2.03(b)(ii) and (iv) read: "(ii) voluntarily commencing any liquidation, dissolution or winding up of the Company or any material Subsidiary; * * * (vi) entering into any agreement with any holder of Equity Securities in such stockholder's capacity as such, as the case may be, which grants such stockholder approval rights similar in type and magnitude to those set forth in this Section 2.03."

Testifying in connection with the drafting of the agreements and the negotiations concerning the language were the attorneys primarily involved: Pamela Seymon, of Wachtell, Lipton, Rosen & Katz, LLP, IAC's primary outside law firm, who has been the lead partner on the IAC engagement since 1995; Seymon's partner, Andrew Nussbaum, who was involved in the 2001 VUE transaction; and Frederick "Buzz" McGrath of Baker Botts, LLP, Liberty's primary outside law firm, who has been the lead partner on Liberty matters related to IAC since 1995. Also testifying were Diller, Malone, and Bennett, Liberty's CEO at the time the 2001 VUE transaction was negotiated.

The evidence presented at trial confirms the plain meaning of section 2.03(a) as articulated above, and rebuts Liberty's assertion that it contains a catch-all provision.

### A. The Drafting History Establishes Section 2.03(a) Does Not Contain A Catch–All Provision

As demonstrated in the recitation of the facts, the language found in section 2.03(a) dates back to the 1995 Term Sheet. The record show that, in 1995, the parties understood the language now in section 2.03(a) to be regulatory in scope. Numerous witnesses testified that the sole purpose for entering into the 1995 Term Sheet was to solve Liberty's regulatory issues.[115] Bennett testified that regulatory counsel from Wilkie Farr was involved in drafting the 1995 agreement.[116] Seymon testified that in 1995, Bill Reyner, FCC counsel for IAC, was involved in drafting the specific language that became section 2.03(a).[117] In addition, there was further testimony that the FCC regularly imposed voting trusts on companies in order to enforce its regulations,[118] and McGrath admitted being aware of this fact in 1995.[119] Given these circumstances, it makes sense that the Third Clause was initially included in the 1995 Term Sheet to address these highly potent and relevant regulatory concerns that differed from divestiture, fines, or penalties-not to provide a catch-all consent right for Liberty. Indeed, the 1995 Term Sheet and 1997 Governance Agreement enumerated many consent rights, including rights over voluntary dissolution, liquidation, or winding up of the company or its subsidiaries, or disposition of assets worth more than 10% of the market value of Silver King's shares. It defies common sense that the parties would specifically

---

115. Tr. 336 (McGrath) ("A. ... [A] structure like that, who could think of that, other than regulatory reasons."); Tr. 485–56 (Bennett); Tr. at 827–28 (Seymon) ("Q. Where did that language come from that was to be inserted here from (i)? A. This is, you know, from the beginning of time it seemed, you know, from the very first transaction in the term sheet, this was the language—I mean, no one ever touched it. It was kind of sacrosanct because it had been the regulatory language from the FCC that had been there and how approval had been obtained from the FCC from Day 1. And no one wanted to go there and try and, you know, review this or add words, delete words.").

116. Tr. at 486 (Bennett); see also Tr. 336 (McGrath).

117. Tr. 828 (Seymon); see also Reyner Dep. 22:23–23:23; ("Q. Do you-are you aware that this fundamental matters provision, paragraph 1 is in substantially the same form, but not exactly the same form, of the current version of the agreement? A. I do understand that. Q. You understand that. Would you understand this provision, paragraph 1 of the fundamental matters, to be limited to addressing future FCC or regulatory burdens that might be imposed on Liberty or Diller? A. Yes."); Tr. 333–34 (McGrath).

118. Tr. at 877, 884–85 (Seymon); Tr. at 933–34 (Nussbaum).

119. Tr. 339 (McGrath).

enumerate these consent rights, while also providing for them to be covered under some general catch-all provision found in the same section of the agreement.

By contrast, there is limited—if not zero—evidence in the trial record supporting the view that in 1995 Liberty viewed the Third Clause as a catch-all. Malone testified that he played no part in negotiating the terms of the agreement and had no view as to whether the Third Clause was a catch-all. Instead, he left such matters to his managers and attorneys. McGrath's trial testimony that he had always viewed the Third Clause as a catch-all, including in 1995, was wholly unconvincing. At trial, McGrath first testified that he formed the opinion in 1995 that the Third Clause contained a catch-all.[120] Yet, he acknowledged that in his deposition, he stated that he did not develop this understanding until sometime after 2001.[121] Surprisingly, McGrath made no effort to explain this substantial conflict in his testimony. Moreover, neither McGrath nor any other Liberty witness could point to any writing from 1995 or any time thereafter supporting McGrath's contention.[122] Finally, McGrath admitted he had never conveyed this understanding to Wachtell or anyone at IAC.[123]

B. *The Parties' Understanding Did Not Change As A Result Of The 2001 VUE Transaction*

The evidence also establishes that the parties' understanding of the language now found in section 2.03(a) as regulatory in scope remained after the 2001 VUE transaction. Even though the language in section 2.03(a) has remained essentially unchanged since 1995, Liberty suggests that it no longer had regulatory problems in 2001, and therefore it would be unreasonable to conclude the parties intended to limit the scope of section 2.03(a) to regulatory concerns. On the contrary, the evidence shows that Liberty was still quite concerned with FCC and antitrust regulations in 2001. Malone admitted during his deposition that he still had FCC and antitrust concerns in 2001,[124] and called himself a "walking regulatory issue."[125] Even

---

120. Tr. 390 (McGrath) (describing the 1995 Term Sheet and stating "it had a catch-all provision at the end"); *see also* Tr. 315 (McGrath).

121. Tr. 391–93 (McGrath); McGrath Dep. 146:1–16 ("Q. And when did you come to the conclusion that there was a fairly good argument in favor of using 2.03(a) as a blocking right? A. Sometime after 2001, I believe. Q. Can you say when? A. I believe, you know, on that topic, probably in the—I think the only time I actually started to look at this again was sometime after 2001. It may have been more—I mean, we're getting into privileged stuff here, so.").

122. Tr. 390 (McGrath).

123. Tr. 352, 390–91 (McGrath). As an aside, this testimony at the very least supports application of the forthright negotiator principle. Chancellor Chandler has noted that extrinsic evidence regarding the "the private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835 (Del.Ch.2007). "[T]he forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party." *Id.* at 836. As a result, McGrath's subjective understanding of the Third Provision cannot be properly considered given the objective manifestation of IAC's understanding that the Third Provision pertained exclusively to regulatory matters.

124. Tr. 115–16 (Malone).

125. Tr. 118 (Malone).

Liberty's own documents indicate that exposure to regulatory sanctions remained a significant concern after 2001.[126]

In addition, the evidence regarding negotiations surrounding the 2001 VUE transaction shows that the parties intended section 2.03(a) to be limited to regulatory impacts on Liberty. On December 11, 2001, Wachtell circulated an initial draft of the 2001 Governance Agreement on USA's behalf. Seymon testified that she circulated this draft after she received a telephone call from Kaufman, who told her that Liberty and IAC had agreed to eliminate the consent rights in the 1997 Governance Agreement subject to an exception in the event IAC became highly leveraged.[127] Although based on the 1997 Governance Agreement, Wachtell's December 11 draft included notable differences. Most importantly, Wachtell had (a) renamed the "Fundamental Changes" provision the "Contingent Matters" provision, (b) eliminated all of the Fundamental Changes enumerated in the 1997 Governance Agreement with the single exception of USA's disposition of assets, businesses, or incurrence of debt worth more than 10% of the market value of USA's outstanding equity, and (3) subjected this lone right to the total debt ratio test.[128]

Liberty's attorneys at Baker Botts reviewed the Wachtell draft and returned their mark-up on December 14, 2001.[129]

This mark-up show that Baker Botts accepted the new "Contingent Matters" heading. However, Baker Botts reinserted, with some modification, a number of the "Fundamental Changes" enumerated in the 1997 Governance Agreement, including (1) the 10% acquisition, dissolution, or indebtedness language, (2) the voluntary liquidation, dissolution, or winding up language, and (3) the old regulatory language now found in section 2.03(a).[130] Baker Botts generally agreed to the debt ratio test, but insisted that the regulatory language not be subject to the debt ratio test.[131]

IAC's attorneys at first questioned the need for the old regulatory language to exist outside the debt ratio test. Seymon testified that when she received Baker Botts's December 14 mark-up, she called McGrath to go over the various additions. When she asked why the old regulatory language was put back in, McGrath responded "You can't make it illegal for us to own the shares."[132] Seymon took this to refer only to IAC's long-standing regulatory concerns and, after conferring with Diller, agreed. The Baker Botts draft also tried to except several other former Fundamental Changes from the debt ratio test. That effort was entirely rejected. McGrath offered no evidence rebutting this testimony. On the contrary, he testified that he had no reason to doubt Seymon's recollection of their call.[133]

126. *See* IX 206 (Liberty's 2002 Form S–4 stating that "our business is subject to risks of adverse government regulations"). The testimony of Liberty's FCC expert, Meredith Senter does not compel a different result. Senter testified that section 2.03(a) contained a catch-all because it did not contain language specifically addressing FCC regulations. *See* Tr. 430–34. However, as he admitted, Senter did not consider the impact of antitrust regulations. *See* Tr. 430; 435–36 (Senter).

127. *See* Tr. 820.

128. IX 31 at WLRKIAC00014353; Tr. 823 (Seymon).

129. JX 33 at BBP—002945–46.

130. *Id.;* Tr. 824 (Seymon).

131. JX 33 at BBP—002945–47.

132. Tr. 825–26 (Seymon).

133. Tr. 359 (McGrath) ("Q. [I]f she testified that you told her that it was so that IAC can't make it illegal for Liberty to hold the shares,

Seymon further testified that she acquiesced to McGrath's request with the clear understanding that it applied only to actions giving rise to regulatory sanctions.[134] Indeed, Seymon testified that she could say with certainty that no one at Liberty told her the Third Clause was a catch-all because Diller never would have agreed to such a provision; Diller had tired of Seagram's and Vivendi's interference and similarly wanted to be free of Liberty's control.[135] This testimony was unrebutted and confirms that the parties thought of section 2.03(a) as regulatory in scope, rather than containing any sort of general catch-all. Indeed, the evidence confirms that the 1997 Governance Agreement specifically gave Liberty consent rights over actions like the spin-off, and

that, in 2001, Liberty agreed to subject these rights to the debt ratio test in exchange for Diller's continued service at IAC.

Bennett's recall of a conversation he claims to have had with Diller in December 2001 does nothing to alter this conclusion. Bennett testified that, like McGrath, he had always secretly viewed the Third Clause as a catch-all.[136] He further testified that he discussed Liberty's consent rights with Diller in December 2001.[137] Bennett's memory about that conversation was hazy and he could not say that they had discussed section 2.03(a) as a catch-all,[138] only that he told Diller the Third Clause could not be subject to the debt ratio test.[139] Diller testified positively that

---

would you say that she wasn't telling the truth? A. It's possible. I don't recall a specific conversation.").

**134.** Tr. 843 (Seymon) ("Q. Did Mr. McGrath ever refer to the provision as a catchall? A. No.").

**135.** Tr. 836 (Seymon) ("Q. Did Mr. McGrath ever suggest to you that he or Liberty considered this provision to have any effect beyond addressing IAC actions that could cause regulatory or legal matters for Liberty? A. No. Q. If he had, would that have been of importance to you in December 2001? A. Alarm bells would have gone off in my head.... That is one that I know the company and Mr. Diller would find very important to them."); Tr. 844 (Seymon) ("A. [T]he whole point of this was to eliminate those types of restrictions.").

Nussbaum, who worked with Seymon on the 2001 VUE transaction, supported Seymon's testimony regarding Liberty's understanding that section 2.03(a) related solely to regulatory matters. Nussbaum stated that it was their understanding, and IAC's understanding, that "the fundamental matters were to go away entirely, other than one that would be subject to a debt ratio test...." Tr. 932 (Nussbaum). Moreover, Nussbaum testified that nobody at Baker Botts ever indicated that section 2.03(a) was anything other than a regulatory provision. In fact, Nussbaum said

any other understanding would have "set off alarm bells." Tr. 935–36 (Nussbaum). Indeed, Nussbaum stated: "[A] fundamental purpose of the transaction was to remove some of the consent rights of the various stockholders, so that the company would be free to govern itself more in a manner that the board as a whole directed.... [T]here had historically been more than one occasion when either Liberty or Universal declined to permit the company to pursue a deal that the board was interested in pursuing. And so if [section 2.03(a)] had been described to me as anything other than a sort of third-party legal regulatory governmental issue, we would have absolutely discussed that with the client and not agreed to it...." Tr. 936 (Nussbaum).

**136.** Tr. 468 (Bennett).

**137.** Tr. 469–70 (Bennett).

**138.** Tr. 507–09 (Bennett). Bennett could not remember when the conversation with Diller occurred, Diller's response, the words Bennett used, or whether he ever discussed the conversation with other people.

**139.** Tr. 471 (Bennett) ("A. Again, my recollection is that he did not want—he wanted to eliminate the rights or at least subject them all to a debt test. It may have been their final

Bennett never mentioned section 2.03(a) to him with respect to the VUE transaction.[140] Bennett also admitted he never memorialized in writing his understanding of section 2.03(a) being a catch-all[141] and stated that he never conveyed this understanding to IAC or its attorneys.[142] The court gives no weight to Bennett's equivocal testimony.

In addition to the testimony, documentary evidence establishes that Liberty had no reason to believe section 2.03(a) contained a catch-all. Wachtell presented a memo summarizing the proposed VUE transaction at IAC's December 14, 2001 board meeting.[143] Describing the Contingent Matters section of Baker Botts's December 14 mark-up, the summary states: "Note: Liberty has proposed that it have an approval right, irrespective of whether the debt/EBITDA test is failed, with respect to (i) transactions in general or changes in USA's line of business which would cause regulatory problems for Liberty, and (ii) affiliate transactions."[144]

IAC board minutes show that Malone and Bennett were present at the meeting,[145] and both Malone and Bennett testified that they attended the meeting.[146] Bennett also testified that board members would have reviewed the memo in the normal course of business.[147] Seymon testified that she presented this memo to the IAC board, and explained it in detail.[148] Malone likewise testified that Seymon reviewed the memo at the meeting.[149] IAC's board minutes indicate that Seymon presented the memo to the board and "explained ... the effect of the Proposed [VUE] Transaction on prior agreements among the Companies, Mr. Diller, Vivendi, Universal Studios, Inc., and Liberty Media Corporation."[150] Had Malone and Bennett truly believed that section 2.03(a) contained a catch-all, surely they would have spoken up at this meeting. They did not.[151]

Moreover, Liberty's own documents undermine Liberty's position that section 2.03(a) contained a catch-all. First, Liberty changed the way it accounted for its

position. And I told him that we were not willing to do that. My recollection is that I expressed that those were fundamental rights for us, that we had to have the ability to protect our voting right in the company. We simply could not subject such a fundamental matter to the leverage test."); Tr. 515 ("Q. So the answer is you believe you told him [2.03 was broader than a regulatory concern], but you don't have a definite recollection of telling that? A. That's correct.").

**140.** Tr. 960 (Diller) ("Q. Did that conversation occur, Mr. Diller? A. No. Q. Are you sure? A. Absolutely.").

**141.** Tr. 506 (Bennett) ("Q. You are not aware of a single piece of paper in the world that confirms that you told Mr. Diller that Section 2.03 had to do with anything other than regulatory issues. Are you? A. I'm not aware of any paper, no.").

**142.** Tr. 496 (Bennett) ("Q. And you don't recall telling anyone in the world that this char-

acterization [of § 2.03(a)] was incorrect ...? A. I don't have a recollection of telling anyone.").

**143.** JX 32.

**144.** Id. at WLRKIACS00019686.

**145.** IX 36 at WLRKIACS00015338.

**146.** Tr. 110 (Malone); Tr. 492 (Bennett).

**147.** Tr. 493–94 (Bennett).

**148.** Tr. 848 (Seymon).

**149.** Tr. 113–14 (Malone)

**150.** IX 36 at WLRKIACS00015339.

**151.** Tr. 496 (Bennett) ("Q. Certainly you don't recall making a point at the board meeting that this was an inaccurate characterization? A. That's correct."); Tr. 848 (Seymon).

investment in IAC following the VUE transaction. As Liberty's chief accountant, Christopher Shean, testified, before the 2001 VUE transaction Liberty accounted for its investment on an equity basis, enabling it to count its share of IAC's income as its own income. According to accounting guidelines, however, Liberty could take this treatment only if it controlled IAC. Before the 2001 VUE transaction, Liberty's consent rights, unhindered by a debt ratio test, apparently satisfied this test for control.

Shean testified, however, that after the 2001 VUE transaction, Liberty's consent rights were subject to a debt ratio test that was very unlikely to ever be met.[152] After reading sections 2.03(a) and (b), Shean concluded in Liberty's 2002 Financial Highlights memorandum that Liberty no longer had the requisite control over IAC to account for its investment on an equity basis and switched to a cost basis. "Following the Vivendi transaction, USA Interactive had approximately $3 billion in net cash, which indicates little if any negative control exists due to the debt ratio condition, *except for limiting activities that would create regulatory issues for Liberty.*"[153] This switch was less attractive because Liberty could no longer count its share of IAC's income as its own. But more importantly, the memo clearly suggests that Liberty understood section 2.03(a) to be a very limited consent right, not a catch-all consent right conferring control over IAC sufficient to continue treating it on an equity basis. Notably, Shean testified that the memo was shared with Liberty and its audit committee at the December 2002 meeting,[154] and minutes of that meeting indicate Bennett was in attendance.[155]

Similarly, Liberty never disclosed its purported catch-all consent right in numerous 13Ds it filed with the SEC, even though McGrath conceded that such information would be material to investors.[156] The documentary evidence suggests that even as late as 2006, Liberty did not consider section 2.03(a) as providing a catch-all consent right. In 2006, Malone emailed Diller and requested that Liberty be allowed to vote its own stock to block a sale of the company.[157] Liberty has offered no explanation for why such a change would be needed if section 2.03(a) provided a catch-all consent right.[158] In addition, IAC's March 2002 proxy statement describes the 2001 VUE transaction as severely limiting Liberty's consent rights, language far from suggesting Liberty re-

152. Tr. 958 (Diller) (stating "I'm fairly famous as a—someone who does not like excessive leverage, and I never could conceive of a situation where we would be at 4 to 1"); Tr. 791 (Shean) (stating "given the conditionality and given the fact that IAC had a very—had a net cash situation on their balance sheet, it wasn't likely, at least in the near term, that we would be able to exercise these rights").

153. IX 57 at KLMC 000014 (emphasis added) (concluding "[d]ue to the reduction in negative control rights combined with limited board representation and no voting control, Liberty concluded that it does not exercise significant influence and therefore should account for its investment in USA Interactive as a cost method investment on an as-if-converted basis."); *see also* IX 58 (same).

154. Tr. 793–94.

155. IX 224.

156. IX 108, LMCE009042; Tr. 376 (McGrath).

157. IX 108, LMCE009042.

158. Malone insisted the issue was simply "unclear," and he wanted clarification. But the email itself characterizes the request as a "change." *See id.*

tained a catch-all consent right.[159] Liberty's attorneys had an opportunity to review this proxy before it was issued, yet none of them raised any concerns.[160]

## VII.

### A. Implied Covenant Of Good Faith And Fair Dealing

Liberty also argues that the implied covenant of good faith and fair dealing precludes Diller from voting the proxy in favor of the proposed single-tier spin-off. According to Liberty, the "spirit" of the "Stockholder Agreement and the Governance Agreement was to permit Diller to operate and control IAC for so long as he served as its CEO, while obligating him to thereafter return to Liberty voting control over an intact company."[161] Liberty's argument is grounded in its belief that Diller became the "steward" of Liberty's controlling position in IAC and that while he did not serve at the direction of Liberty, "he was not permitted to destroy the voting power itself."[162]

■■■ The duty of good faith has been defined as "the obligation to preserve the spirit of the bargain rather than the letter, the adherence to substance rather than form."[163] Therefore, the "implied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."[164]

■■■ Here, Liberty relies on the implied duty of good faith and fair dealing to arbitrarily interject an overarching fiduciary relationship into the 2005 Governance Agreement and the 2005 Stockholder Agreement. According to Liberty, this implied duty requires Diller to preserve its voting interest in IAC as Liberty may dictate. The parties, however, memorialized the scope of Diller's proxy in the 2005 Governance Agreement and those bargained-for provisions clearly negate the possibility that Diller's exercise of his voting rights is subject to some broader undefined standard, such as a fiduciary duty.[165] The 2005 Governance Agreement expressly covered transactions, such as the proposed spin-off, in section 2.03(b)(i). And, as discussed, since the 4:1 debt ratio test has not been triggered, the only consent right available to Liberty is under section 2.03(a), which pertains only to regulatory matters. Thus, the 2005 Stockholders Agreement and the 2005 Governance Agreement permit Diller to vote Liberty's shares in favor of the proposed single-tier spin-off transaction.[166] "[W]here the sub-

---

159. IX 47 at 21.

160. IX 44.

161. Pls.' Pre–Trial Br. 76.

162. Id. at 76–77.

163. Pierce v. Int'l Ins. Co., 671 A.2d 1361, 1366 (Del.1996) (quoting 3A CORBIN ON CONTRACTS § 654A (1994)).

164. Allied Capital Corp. v. GC–Sun Holdings, L.P., 910 A.2d 1020, 1032–33 (Del.Ch.2006).

165. "[C]ourts will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong." Abex Inc. v. Koll Real Estate Group., Inc., 1994 WL 728827, at *12 (Del.Ch. Dec. 22, 1994).

166. See Allied Capital, 910 A.2d at 1034 ("[C]ourts will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiations process."); see also Shenandoah Life Ins. Co. v. Valero Energy Corp., 1988 WL 63491, at *8 (Del.Ch. June 21, 1988) (stating when "a specific, negotiated provision directly treats the subject of the alleged wrong and has been

ject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."[167]

In addition, Liberty's understanding of the "spirit" of the 2005 Governance Agreement and the 2005 Stockholder Agreement is incorrect. The "spirit" of these agreements was to grant Diller broad power to vote the Liberty proxy, subject to a few narrowly defined consent rights. If this court were to rely on the implied covenant of good faith and fair dealing Liberty suggests to read in a broad fiduciary obligation, it would undermine the bargain reached by the parties.

## VIII.

A. *A Single–Tier Spin–Off Will Not Violate Section 5.1 Of The Stockholders Agreement*

Liberty contends that section 5.1 of the 2005 Stockholders Agreement provides an independent basis to prevent a single-tier spin-off. That section is part of Article V, titled "BDTV Entity Arrangements" and reads as follows:

*Management.* The business and affairs of each BDTV Entity will be managed by a Board of Directors elected by the holders of a majority of the voting equity interests in such BDTV Entity. Notwithstanding the foregoing, the taking of any action by a BDTV Entity with respect to (i) to the extent permitted by applicable law, any matter that would have constituted a Fundamental Change under the 1997 Stockholders Agreement (as applied to such BDTV Entity and to the Common Shares, mutatis mutandis)

... will require the unanimous approval of the holders of all voting and non-voting interests in such BDTV Entity.

Liberty begins by pointing out that the 1997 Stockholders Agreement referred to in section 5.1 defines "Fundamental Change" as having the same meaning as in the 1997 Governance Agreement. Liberty then notes that one of the Fundamental Changes defined in the 1997 Governance Agreement (Section 2.04(ii)) is the "[a]cquisition or disposition ... of any assets (including debt and/or equity securities) ... with a value of 10% or more of the market value of the Total Equity Securities at the time of such transaction."[168] Because, Liberty argues, the spin-off will involve a disposition of more than 10% in value of the IAC shares held by the BDTV Entities, it follows that section 5.1 imposes a unanimous consent requirement of all BDTV equity holders, including Liberty.

This position suffers from several critical flaws. First, the list of things that "would have constituted a Fundamental Change under the 1997 Stockholder Agreement" is essentially the same as the list of Contingent Matters set forth in section 2.03(b) of the 2005 Governance Agreement, without the total debt ratio test introduced by agreement between the parties in 2001. Indeed, the 10% acquisition or disposition language relied on by Liberty from the 1997 Governance Agreement is itself now found in subsection 2.03(b)(i) of the 2005 Governance Agreement and specifies one of the circumstances that requires Liberty's consent only in the event the total debt ratio equals or exceeds 4:1. Thus, if section 5.1 is read to restrict actions planned to be

found to have not been violated, it is quite unlikely that a court will find by implication a contractual obligation of a different kind that has been breached").

**167.** *Dave Greytak Enter., Inc. v. Mazda Motors of Am., Inc.,* 622 A.2d 14, 23 (Del.Ch.1992).

**168.** JX 23 at 16–18.

taken by the IAC board of directors or IAC stockholders—and not just those things done at the BDTV Entity level—it would wholly circumvent and render nugatory the parties' clear and manifest agreement in 2001 to subject the list of Fundamental Changes to the 4:1 total debt ratio test. Obviously, such an interpretation is disfavored in the law and, in any event, finds no support in the testimony.

Liberty also confuses actions taken by one of the BDTV Entities and actions taken by IAC. Section 5.1 is part of an article captioned "BDTV Entity Arrangements" and is expressly limited by its terms to "the taking of any action by a BDTV Entity." The proposed spin-off, however, does not depend on any action by the BDTV Entities, which are wholly passive vehicles existing solely for the purpose of holding Liberty's IAC shares. Instead, the spin-off will be authorized either by the IAC board acting alone or in conjunction with a vote of the IAC stockholders. In either case, as a matter of Delaware law, no corporate action by the BDTV Entities is needed to authorize the spin-off.

This distinction is also found in Diller's proxy itself, which operates at the IAC entity level, not at the BDTV level or the level of any of the other Liberty entities that hold the IAC shares subject to the proxy. Maffei himself testified that, assuming Diller's proxy remains in effect, Diller can vote the IAC shares held by the BDTV Entities without causing those entities to do anything. In other words, as Maffei recognized, Diller's proxy is, in effect, outside the BDTV Entities.[169] Thus, Liberty's argument about section 5.1 fails for the additional reason that the very

language of the section precludes its application to actions taken by IAC.

Finally, it must be noted that Liberty's argument fundamentally misconstrues section 5.1 That section does not incorporate the list of Fundamental Changes as they are written in the 1997 Stockholders Agreement. Rather, it incorporates them only "as applied to such BDTV Entity and to the Common Shares, mutatis mutandis." The meaning of this "useful Latinism" [170] is "the necessary changes having been made...."[171] For example, in the very 10% disposition clause Liberty cites to, it is necessary to change the language to apply to the BDTV Entities. Thus, the language "[a]ny acquisition or disposition ..., directly or indirectly, by the Company" must be understood to read "[a]ny acquisition or disposition ..., directly or indirectly, by the BDTV Entity." This simple alteration renders the clause completely inapplicable to the spin-off and is certainly required by the instruction to change the matter constituting a Fundamental Change, mutatis mutandis to apply it to the BDTV Entities.

That result is hardly surprising, as the matters defined as "Fundamental Changes" in the 1997 agreements were meant to be applied as though they were rewritten to fit the circumstances of the management of the BDTV Entities—not that of IAC. Chief among those circumstances at the time the 2001 Stockholders Agreement was entered into was that Diller owned 0.1% of the equity of the BDTV Entities but controlled 100% of the voting stock and also served for each of them as the sole director and officer. Thus, he had complete power, as a matter of corporate law, to effect change at the BDTV Enti-

---

**169.** Tr. 596 (Maffei).

**170.** Bryan A. Garner, A Dictionary of Modern Legal Usage 578 (2d ed. 1995).

**171.** Id.

ties. Plainly, section 5.1's reference to the Fundamental Change provisions of the 1997 Stockholders Agreement was intended to limit Diller's ability to effect material changes at the BDTV Entities without Liberty's consent. The need for Liberty to continue having such protection at that level in 2001 was self-evident and incontestable. At the same time, the need to continue Liberty's protection at that level had nothing to do with the virtual elimination of comparable controls at the IAC level.

## B. *The BDTV Entity Charters Are Irrelevant*

■ The BDTV Entity certificates of incorporation contain provisions that prohibit those entities from taking "any action" with respect to various enumerated matters, including, among other things, "engaging in any business other than holding[ ]" shares of IAC stock. Since the spin-off will result in the BDTV Entities receiving shares of the spincos, Liberty argues that Diller is prohibited by those charter provisions from voting in favor of the spin-off. The simplest answer to this argument is that, as Maffei acknowledged, Diller will not, by voting his proxy, cause the BDTV Entities to take any action. Moreover, it is clear that Liberty holds in its own hands the complete power to amend the BDTV Entity charters to resolve any technical problem the spin-off may cause those entities. Indeed, Liberty took similar action in connection with the 2005 Expedia spin-off.[172] Thus, these charter provisions are irrelevant to any

action taken at the IAC level, including the proposed spin-off.

## C. *IAC Charter*

■ Liberty argues that the single-tier structure of the proposed spin-off would violate Article IV(C) of the IAC certificate of incorporation. That provision reads:

In no event shall any stock dividends or stock splits or combinations of stock be declared or made on Common Stock or Class B Common Stock unless the shares of Common Stock and Class B Common Stock at the time outstanding are treated equally and identically.[173]

Liberty contends that the proposed spin-off is clearly a "stock dividend" because "[a]ny reasonable, objective reader would consider a dividend of stock in a subsidiary a stock dividend." According to Liberty, "implementing the spin-off of any of IAC's subsidiaries by declaring a dividend of subsidiary stock on each share of IAC's stock involves a 'stock dividend.'"[174] In support of this position, Liberty cites two Delaware cases that use the term "stock dividend" to describe spin-offs substantially similar to the proposed spin-off.[175]

Liberty also cites materials from a February 2007 Allen & Company presentation to the IAC board in connection with a plan to spin-off HSN. Those materials state that "'[t]he Transaction would take the form of a tax-free dividend whereby each shareholder of IAC would receive a stock dividend representing equity in the Spin-Co.'"[176] In addition, Liberty cites to several IAC drafts of a November 5, 2007, press release announcing the proposed spin-off and describing it as a "'stock divi-

172. LX 40.

173. Article IV(C) JX 92.

174. Pls.' Pre–Trial Br. 63.

175. *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1172 (Del.1988); *In re MCA, Inc.*, 598 A.2d 687, 690 (Del.Ch.1991).

176. Pls.' Pre–Trial Br. 64 (quoting JX 139 at 2) (emphasis omitted).

dend.' "[177]

In response, IAC contends that while Article IV(C) requires a "stock dividend" to maintain the two-tier voting structure in IAC, the proposed spin-off is not a "stock dividend," but a "distribution of shares in another corporation."[178] As a result, the proposed spin-off is controlled by different provisions in the IAC charter that do not require a two-tier voting structure.[179] According to IAC, the Delaware Supreme Court, in *duPont v. duPont*[180] and *Fulweiler v. Spruance*,[181] made clear that "spun-off shares of stock in another corporation are not 'stock dividends.' "[182]

Liberty is correct that in the *Anadarko* and *MCA* decisions the Supreme Court and this court independently describe a spin-off of a wholly owned subsidiary through a distribution of shares as a "stock dividend."[183] However, the significance of the legal distinction of the term "stock dividend" was not at issue in those cases. Therefore, those passing references do not undercut the widely acknowledged technical understanding of the term "stock dividend" and the supporting Delaware precedent squarely addressing this issue.

With respect to Delaware case law, several decisions are instructive. Foremost, the Delaware Supreme Court in *Lynam v. Gallagher*[184] distinguished between "a cash dividend, a stock dividend, and a stock split." In *Lynam*, the court described a stock dividend as a "dividend payable in stock instead of cash."[185] The court further stated:

> A stock dividend takes nothing from the property of the corporation and adds nothing to the interests of the stockholders. The title to all corporate property remains in the corporation; however,

---

177. *Id.* at 6.

178. Defs.' Pre–Trial Br. 84.

179. According to IAC, those provisions are Article IV(A) and IV(B). Article IV(A), which relates to the common stock, provides:
(1) The holders of the Common Stock shall be entitled to receive, share for share with the holders of shares of Class B Common Stock, such dividends if, as and when declared from time to time by the Board of Directors.
(2) In the event of the voluntary or involuntary ... dissolution ... the holders of the Common Stock shall be entitled to receive, share for share with the holders of the shares of Class B Common Stock, all the assets of the Corporation of whatever kind available for distribution to Stockholders, after the rights of the holders of the Preferred Stock have been satisfied.
Article IV(B), which relates to Class B common stock, provides:
(1) The holders of the Class B Common Stock shall be entitled to receive, share for share with the holders of shares of Common Stock, such dividends if, as and when declared from time to time by the Board of Directors.

(2) In the event of the voluntary or involuntary ... dissolution ... the holders of the Class B Common Stock shall be entitled to receive, share for share with the holders of shares of Common Stock, all the assets of the Corporation of whatever kind available for distribution to Stockholders, after the rights of the holders of the Preferred Stock have been satisfied.

180. 208 A.2d 509 (Del.1965).

181. 222 A.2d 555 (Del.1966).

182. Defs.' Pre–Trial Br. 84.

183. *See Anadarko*, 545 A.2d at 1172 ("The lawsuit arises from a spin-off of a Panhandle's wholly-owned subsidiary, Anadarko, through a stock dividend."); *MCA*, 598 A.2d at 690 ("According to the Merger Agreement, 100% of Pinelands' stock was to be distributed to the MCA shareholders *pro rata* in the form of a stock dividend prior to the completion of the tender offer.")

184. 526 A.2d 878 (Del.1987).

185. *Lynam*, 526 A.2d at 882.

corporate profits previously available for distribution in cash dividends are permanently appropriated to fixed capital.... [A] stock dividend does not distribute property to the stockholders; it merely changes the form of their investment by increasing the number of their shares, thereby diminishing the value of each share and leaving the aggregate value of their stock in the corporation the same.[186]

The Supreme Court's analysis is consistent with the widely understood notion, recognized in this court, that a dividend is " 'a distribution by a corporation to its shareholders of a share of the earnings of the corporation.' "[187] This is also consistent with IAC's characterization that a " 'stock dividend' is essentially a split of a class of stock executed through a declaration of a dividend of stock of the corporation in question."[188]

In addition, the *duPont* and *Fulweiler* cases cited by IAC support the conclusion that the proposed spin-off is not a stock dividend. In *Fulweiler*, the Supreme Court reflected on its decision in *duPont*, stating:

> In *duPont v. duPont*, we held that the divestiture by the duPont Company of its General Motors stock was not a stock split, a stock dividend, or an 80% Liquidating dividend as a preliminary step toward total corporate liquidation. But

we did not pass upon the question of what in fact it was because the question was not before us.[189]

The Supreme Court then went on to reach that question and concluded "the divestiture by duPont of its General Motors stock ... was in fact a court-compelled return of capital to duPont's shareholders. As such, it is not a dividend, either of cash or stock...."[190] The proposed spin-off is not a distribution out of the earnings of IAC and it is not a distribution of stock in IAC that would otherwise be paid as a cash dividend. Thus, the proposed spin-off is not a stock dividend within the meaning of Article IV(C). Rather, as noted by IAC, the proposed spin-off would be a "distribution of shares in new companies ... distinct from IAC."[191]

Finally, the mischaracterizations by the Allen & Company and IAC employees relied upon by Liberty have no bearing on the court's analysis. It would be entirely inappropriate to conclude, contrary to the controlling and persuasive authority discussed above, that the proposed spin-off constituted a stock dividend merely because that term was misused in a board presentation and in draft press releases. Importantly, there is nothing in the record to suggest that IAC or its counsel ever took the position that the proposed spin-off was a stock dividend under Article IV(C).[192]

186. *Id.* at 882 (citations omitted).

187. *Technicorp Intern. II, v. Johnston,* 2000 WL 713750, at *29 (Del.Ch. May 31, 2000) (quoting *Fulweiler,* 222 A.2d at 558).

188. Defs.' Pre–Trial Br. 84.

189. *Fulweiler,* 222 at 559.

190. *Id.*

191. *Id.*

192. IAC also asks this court to hold that Article IV(A) and IV(B) of the IAC charter (*see*

note 179, *supra*) require a spin-off in the form of a "general" dividend to have a single tier voting structure. According to IAC, "these provisions make clear [that] the rights of IAC's Common Stock and Class B Common Stock with respect to distribution of assets or general dividends are exactly the same." Pls.' Pre–Trial Br. 86. The court declines to address this issue. As evidenced by the fact that the Expedia spin-off was structured on a two-tier basis, IAC does not maintain that its charter prohibits two-tier spin-offs. Thus, the court has no occasion to consider whether the choice of a particular form of transaction

## X.

For all the foregoing reasons, judgment will be entered in the 225 Action in favor of the defendants and against the plaintiffs and that action is DISMISSED WITH PREJUDICE. In addition, in the Diller Action and the Liberty Action, judgment will be entered finally determining that Liberty does not have a right to consent to the proposed spin-off based on section 2.03(a) of the 2005 Governance Agreement, section 5.01 of the 2005 Stockholders Agreement, or Article IV(C) of the IAC

certificate of incorporation. Counsel for the plaintiffs in the Diller Action are directed to prepare a form of judgment in accordance with this opinion and submit it, on notice, within 5 days of the date hereof. IT IS SO ORDERED.

might entail such a prohibition. Clearly, IAC has the ability to alter the transactional nature of a spin-off to both achieve its desired ends and comply with the IAC charter. Moreover, the court observes that impedi-

ments in the IAC charter may be subject to elimination via a charter amendment.