NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3573
_____

L.P.P.R., INC; LEHIGH PRESS PHARMACEUTICAL
Products, INC.

v.

KELLER CRESCENT CORPORATION;
CLONDALKIN GROUP, INC,
                                                    Appellants

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cv-2872)
District Judge:  Hon. Michael M. Baylson

_____

Argued
May 31, 2013

Before:  JORDAN and VANASKIE, *Circuit Judges*, and
RAKOFF*, *Senior District Judge.*

(Filed: July 24, 2013)
_____

_____
        * The Honorable Jed S. Rakoff, United States Senior District Judge for the United
States District Court for the Southern District of New York, sitting by designation.

Patrick R. Kingsley  [ARGUED]
Karl S. Myers
Stradley, Ronon, Stevens & Young
2005 Market Street – Ste. 2600
Philadelphia, PA  19103
     *Counsel for Appellants*

Philip G. Kircher
Aaron Krauss  [ARGUED]
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
     *Counsel for Appellee*

————————

## OPINION OF THE COURT

————————

JORDAN, *Circuit Judge*.

Defendants-Appellants Keller Crescent Corp. and Clondalkin Group, Inc. (collectively, "Keller") appeal the denial by the United States District Court for the Eastern District of Pennsylvania of their post-trial motions for judgment as a matter of law and a new trial under Rules 50 and 59 of the Federal Rules of Civil Procedure. The jury had returned a split verdict partially favoring Keller and partially favoring Plaintiffs-Appellees L.P.P.R, Inc. and Lehigh Press Pharmaceutical Products, Inc. (collectively, "Lehigh"). For the reasons that follow, we will reverse the District Court's denial of Keller's motion for judgment as a matter of law.

## I.    Background

At its discretion, Puerto Rico offers a tax credit to the purchaser of a distressed Puerto Rican business if the purchaser guarantees that it will continue operations in

Puerto Rico for at least ten years. If the purchased company shuts down before that time, the purchaser must return a share of the credit proportional to the number of years under ten that it did not operate. The government will issue the credit only to a purchaser that guarantees its promise to remain in business by posting collateral, typically, but not necessarily, in the form of a bond. P.R. Laws Ann. tit. 13, § 10646(d). The purchaser may either use the tax credit itself, or it may sell it.

Through two Asset Purchase Agreements (the "Contract"[1]), Keller agreed to purchase Lehigh's distressed Puerto Rico-based printing businesses. The Contract provided that Keller would sell the potential tax credits and that the parties would share the "net proceeds" from that sale – described in the Contract as the "net of costs incurred by Purchaser [Keller] in connection with collecting and selling such tax credits." (App. at 1844, 2043.) The parties never discussed what specifically would constitute a cost incurred in the "collecting and selling" of the tax credits. Under the Contract, ninety percent of the net proceeds of the sale of the tax credits were to be allocated to Lehigh and ten percent to Keller.

To secure the tax credits, Keller posted a series of bonds whose premiums total $317,917. Puerto Rico granted the credits in the amount of $2.1 million, which Keller then sold for $1,858,500 to a third-party purchaser. From that amount, Keller paid the tax credit broker it had hired a fee of $73,500. Before transferring to Lehigh its share of

---

[1] The two agreements, one with Lehigh Press and one with L.P.P.R., are largely the same, and the specific provisions at issue in this appeal are identical. For ease of reference, we thus refer to the "Contract" in the singular.

3

the remaining proceeds, Keller provided a spreadsheet listing additional amounts Keller planned to deduct for the "costs of securing and selling the tax credits." (*Id.* at 2443, 2445.) Those costs included the $317,917 cost of the bonds[2] and $207,542 in legal fees. Keller then deducted the cost of the bonds and legal fees and transferred ninety percent of the remaining $1,133,587 to Lehigh.

Believing that those costs did not qualify as costs of "collecting and selling" the tax credits, Lehigh brought this diversity action against Keller in the District Court.[3] Lehigh asserted that Keller breached the parties' contract by deducting both the costs of the tax credit bonds and the Puerto Rico tax lawyer's professional fees, before distributing the proceeds of the sale of the credits.

Following discovery, Keller moved for summary judgment, contending that, under the plain meaning of the Contract, it committed no breach because the word "collecting" in the Contract "unambiguously refers to securing or obtaining the tax credit from the Puerto Rican tax authorities." (*Id.* at 666.) Keller therefore insisted that both the costs of the tax bonds and the attorneys' fees were among the costs of "collecting and selling" the

---

[2] Keller paid the premiums for the first three years of bond coverage. Although it had only made three, rather than ten, years of premium payments, Keller deducted all ten years of projected premium payments from the proceeds of the sale of the tax credits, discounted to their net present value.

[3] Although the Contract provided that it was to be "governed and construed in accordance with the laws of the State of Delaware," it also specified that "all actions or proceedings arising in connection" with the Contract "shall be tried and litigated exclusively in the Federal court located in the Eastern District of Pennsylvania." (App. at 1857.) Lehigh originally pleaded numerous causes of action in the District Court, but the only claim at issue in this appeal, and the only one that went to the jury, is Lehigh's single count for breach of contract (Count I in Lehigh's amended complaint). That is the only claim we discuss.

tax credits. In opposition, Lehigh offered a competing interpretation of the Contract under which the word "collecting" would refer only to the "costs incurred in collecting the proceeds of selling the tax credits," such as "bank transfer fees and the cost of pursuing payment if the buyer refused to pay in a timely fashion." (*Id.*) In support of that interpretation, Lehigh maintained that "one cannot 'collect' a tax credit," but may only claim it. (*Id.*)

The District Court acknowledged that "the parties differ greatly in their interpretation of what the words of the contract mean" (*id.* at 671), but it nonetheless declined to decide which interpretation was correct or even to determine whether the contractual language is susceptible of more than one meaning and therefore is ambiguous. The Court explained that "[t]he briefs and appendices in this case are over four inches thick," and that it could "prepare and preside over a jury trial, and reach a verdict in the same or less time than it would take to carefully review the filings and do the appropriate research." (*Id.*) The Court specified that it was "not necessarily finding that these terms are ambiguous or are not ambiguous," but was rather denying the motion for "prudential reasons." (*Id.* 670-71.)

The District Court's decision to sidestep the interpretation question left the parties in an awkward position. Before trial, Keller filed a motion in limine asking the Court to hold that the terms of the Contract are unambiguous and to accordingly bar any testimony contradicting the terms of the written contract under the parol evidence rule. The Court granted the motion, stating that at trial it would not allow any parol evidence to "contradict[] the terms of the written contract." (*Id.* at 1105.) Of that ruling, the Court

5

stated that it did "not rul[e] that the[] terms [of the Contract] were ambiguous," because "[t]he words … collecting and selling … are normal English words. There's nothing … ambiguous about them." (*Id.* at 1109-10.) Despite the parties' continued dispute over how the words "collecting and selling" should be understood in the Contract, the Court did not explain at that time, or any time throughout this litigation, what those terms mean.

At trial, however, the Court did allow Lehigh's witnesses to testify, over Keller's repeated and strenuous objections, about their personal understanding of the Contract, which happened to coincide with Lehigh's pre-trial interpretation. For example, Pedro Notario, Lehigh's accountant and lawyer, was asked his "understanding" of the meaning of "net of costs incurred by purchaser in connection with collecting and selling such tax credits." (*Id.* at 3011.) Keller's counsel objected to that question on the basis of the parol evidence rule, but the Court overruled the objection. Notario responded:

> Okay. Well, there is no reference in the law or the regulations to collecting a tax credit. When you see the word collecting on this agreement, you can only – in the general usage, I understand that you can only collect something to which you are entitled to and you have a right. Since you cannot collect something that you do not have a right, collecting needs to happen after you have generated and own the tax credit.
>
> Since there is no way to collect money from the government of Puerto Rico, in order to collect money with regards to a tax credit, you need to sell the credit to a third party and then collect the money from the third party, if he doesn't pay as agreed to in the sale agreement with the buyer of the credit.

(*Id.* at 3012-13.) Keller objected again, asking the Court to strike Notario's testimony. The Court refused, but instead instructed the jury that Notario's testimony constituted

6

"his understanding of the terms, and [that it] may not consider that to be any contradiction of the words in the agreement because we're all bound by that selling – the cost of selling and collecting. … [T]hose are English words … ." (*Id.* at 3013.) At another point in his testimony, Notario testified, once again over Keller's objection, that the word "collect" either was mere susplusage or the phrase "collecting and selling" really meant "selling the credit" and thereafter "collecting the monies from the buyer of the credits." (*Id.* at 3008-09 ("You need to sell the credit, and any monies that you're going to collect, you need to collect from the buyer of the credits.").)

Peter Schaefer, a consultant to Lehigh during Contract negotiations, was also asked, over Keller's objection, his "understanding of the words … 'net of costs incurred by purchaser in connection with collecting and selling such tax credits'" at the time he "w[as] negotiating this asset purchase agreement." (*Id.* at 2763.) He said that "brokerage fees, bank fees, maybe wiring charges, things of that nature," could be considered "the selling cost." (*Id.* at 2764.) As for the cost of collecting, he claimed that he "hadn't envisioned collection costs because you aren't collecting the credits." (*Id.*) What he had "envisioned that to mean," rather, "would be in the unlikely event that the credits had been sold and the buyer of the credits did not live up to the agreement that they had made." (*Id.*) In other words, "if they were to make subsequent payments and they did not make those payments, that would be the cost of going to collect the payments from that buyer." (*Id.*)

And John DePaul, former chairman of Lehigh's board, testified regarding pre-Contract discussions about the expected selling price of the tax credits. He said that the

7

bonds could not have been a cost "incurred in collecting and selling the tax credit," but rather were simply "a cost of buying the company," to be shouldered by Keller alone. (*Id.* at 24.) He explained that, as chairman of the board, he would have refused to "post the collateral or share in the posting of the collateral," because that would be akin to requiring Lehigh "to post collateral of a million dollars that [Keller] will keep the plant open for the next ten years." (*Id.*) According to DePaul, that would constitute an unwise business decision because Lehigh would have no "control" over whether Keller "kept the plant open for ten years or not." (*Id.*)

At the conclusion of the evidence, Keller filed a Rule 50 motion for judgment as a matter of law, which the Court denied, allowing the breach of contract claim to go to the jury. Specifically, the jury was asked, via separate verdict sheets, to decide whether Keller had breached the Contract by deducting the cost of the tax credit bonds and the cost of the Puerto Rico tax lawyer's fees. The Court explained that "the words in the contract are clear. 'Cost,' 'selling,' and 'collecting' are not ambiguous terms" (*id.* at 10), and it instructed the jury that, because the Contract was unambiguous, "its plain meaning alone dictates the outcome" (*id.*; *see also id.* at 14 (instructing the jury that "cost, collecting, and selling" are "US English words, and each must be given their plain and ordinary meaning")). The jury was therefore to "ascribe to the words of [the] contract their common or ordinary meaning, and interpret them as would an objectively, reasonable third-party observer." (*Id.* at 14.) In a final jury instruction, the Court told the jury that it must not use trial testimony to contradict the written terms of the Contract:

8

> [C]ontract law does not allow the parties to offer any evidence for the purpose of contradicting or changing the terms of an unambiguous agreement. The testimony you have heard in the case may not be used or considered by you to alter, change, or modify the terms of the agreement in determining whether Keller breached the agreement. However, you may use the testimony that you found credible to determine the background, the context, the intent of the parties, and their understanding of the terms of the agreement.

(*Id.*) The jury ultimately returned a split verdict, finding that the attorneys' fees were costs of "collecting and selling" the tax credits (and thus were appropriately deducted), but that the bonds were not.

Keller then filed another Rule 50 motion, and a Rule 59 motion for a new trial, insisting that the testimony described above constituted inadmissible parol evidence that tainted the outcome of the trial. The Court denied both motions. Saying that the testimony "enabled the jury to better understand the complex subject matter of this case and to complete effectively its job of finder of fact, including, whether, as a matter of fact, Keller breached the Contract," (*id.* at 11) the Court declared that "the evidence in question was not admitted to alter the terms of the written agreement or to create a new term not present on the face of the Contract" (*id.* at 15). Instead, the Court said that, "in view of the fact that Puerto Rican tax credits … are outside the scope of the jury's knowledge," the testimony provided relevant "background to aid the jury in fulfilling its role as fact finder." (*Id.*)

Ultimately, the Court concluded that the "jury competently carried out its job as fact-finder to determine whether Keller breached the contract by subtracting its attorneys'

fees and bond premium," and it denied Keller's Rule 50 and Rule 59 motions. (*Id.* at 25-26.) This appeal followed.

## II. Discussion[4]

We engage in plenary review of a district court's denial of a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001). A motion for a "Rule 50 directed verdict … may be granted only if, as a matter of law, viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987). Given that Keller's position hinges on a question of contract interpretation, to rule for Keller "we must conclude that the contract is so clear it can only be read one way," *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 149 (3d Cir. 1992) – namely, to mean that the costs of "collecting and selling" the tax credits unambiguously includes the costs associated with posting collateral, which are necessary to obtaining the credits. The "question of whether contract terms are clear or ambiguous is one of law." *Id.* We conclude that the terms are unambiguous and that the District Court erred in denying Keller's Rule 50 motions for judgment as a matter of law.[5]

---

[4] The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

[5] Given our view that Keller merits judgment as a matter of law, *see infra*, we need not address the District Court's denial of Keller's Rule 59 motion for a new trial.

The court and jury occupy distinct roles in contract interpretation. "It is the function of the court to make the preliminary determination, out of hearing of the factfinder, as to whether an ambiguity *may* exist." *Tigg*, 822 F.2d at 362-63. "Whether a contract is ambiguous is a question of law." *Id.* at 362. In making that initial determination, courts applying Delaware law are "guided by the 'elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract.'" *In re IAC/InterActive Corp.*, 948 A.2d 471, 494 (Del. Ch. 2008) (quoting *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del. 1992)). "[C]ontract terms are not ambiguous merely because the parties to the contract disagree; rather, the court stands in the shoes of an objectively reasonable third-party observer, and ascertains whether the contract language is unmistakably clear." *Id.* (alterations and internal quotation marks omitted). "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992); *see also U.S. West, Inc. v. Time Warner, Inc.*, Civ. A. No. 14555, 1996 WL 307445, at *9 (Del. Ch., June 6, 1996) ("The primary rule of construction is this: where the parties have created an unambiguous integrated written statement of their contract, the language of that contract (not as subjectively understood by either party but) as understood by a hypothetical reasonable third party will control."). "Absent some ambiguity, Delaware courts will not destroy or twist … [contract] language under the guise of construing it." *Rhone-Poulenc*, 616 A.2d at 1195.

In addition, "Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive," and "[c]ontracts are to be interpreted in a way that does not render any provisions illusory or meaningless." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (internal quotation marks omitted); *see also In re IAC/Interactive Corp.*, 948 A.2d at 497 ("Delaware courts do prefer to interpret contracts to give effect to each term rather than to construe them in a way that renders some terms repetitive or mere surplusage." (internal quotation marks omitted)). If the court determines that the contract is unambiguous, "the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993); *see also Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 503 (D. Del. 2010) ("Upon concluding that the contract clearly and unambiguously reflects the parties' intent, the court's interpretation of the contract must be confined to the four corners of the document." (internal quotation marks omitted)).

The factfinder plays a role in contract interpretation under Delaware law only when the court, without looking to any "evidence from outside the contract's four corners," determines that the words of the contract are ambiguous, meaning that "reasonable minds could differ as to the contract's meaning." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012). Only then does "a factual dispute result[]" regarding the intended meaning of the ambiguous terms, and the factfinder may then "consider admissible extrinsic evidence" to resolve that dispute. *Id.*;

12

*see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (holding that a contract provision was ambiguous, reversing summary judgment, and remanding for a consideration of extrinsic evidence by the Court of Chancery as factfinder).

Thus, although the jury has a role in determining, through a factual inquiry, the parties' intentions regarding an ambiguous contract provision, there is no role for the jury to play in contract interpretation when there is no ambiguity. That is a matter of settled law. *See Pennbarr*, 976 F.2d 145 (reversing district court and overturning jury verdict where contract was unambiguous and therefore summary judgment should have been entered); *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334 & n.11 (Del. 2012) (court has "long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous" (internal quotation marks omitted)); *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) ("[T]he threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous. Ambiguity does not exist simply because the parties disagree about what the contract means. Moreover, extrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning.").

Yet the District Court, although it repeatedly said that the disputed terms are not ambiguous, never stated what they unambiguously mean. In other words, it never chose which of the parties' divergent interpretations was correct – Keller's interpretation that "collecting … tax credits" included the costs associated with obtaining the credits, or

13

Lehigh's interpretation that "collecting … tax credits" referred only to the costs of collecting payment from the third-party purchaser of the tax credits, something that would occur only after the purchaser underwent the expense of posting a bond to obtain the credits.[6]

The result of the District Court's decision not to opine on the meaning of the disputed words was a series of objections and related problems at trial, as the jury's factfinding role morphed into a duty to rule on the meaning of disputed terms that the Court had already decided were not fairly susceptible of more than one interpretation. The Court instructed the jury to "interpret [the Contract] as would an objectively, reasonable third-party observer" (App. at 14), but that is a role that should have been played by the Court itself, not the jury. *See In re IAC/InterActive Corp.*, 948 A.2d at 494 (explaining that it is "the *court* [that] stands in the shoes of an objectively reasonable third-party observer" to interpret a contract (emphasis added) (alterations and internal quotation marks omitted)). Adding to the difficulties, the Court repeatedly allowed the jury to receive evidence of the Contract's meaning from outside the four corners of the Contract, something that should not occur with regard to unambiguous contract provisions. *See City Investing*, 624 A.2d at 1198 ("If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole

---

[6] The District Court acknowledged that the posting of collateral was a prerequisite of acquiring the tax credit, stating that Lehigh "did not dispute … that before Keller could complete the process of collecting and selling, Keller had to acquire a bond." (App. at 23 (internal quotation marks omitted).) In a similar vein, Lehigh admitted in its brief that "a bond is and was the most common form of security posted to secure tax credits." (Appellees' Br. at 7.)

source for gaining an understanding of intent."). The jury therefore was not, as the District Court said, "competently carr[ying] out its job as fact-finder," but rather, at the Court's insistence, was filling the judicial role of contract interpreter, and it did so subject to the improper testimony of Lehigh's witnesses regarding their personal understanding of the Contract terms.

We agree with the District Court that the disputed words of the Contract are unambiguous. They can reasonably bear Keller's interpretation of them but not Lehigh's, and no other interpretation has been suggested. In other words, the Contract is not "reasonably susceptible" of any suggested meaning but the one Keller ascribes to it, and it therefore cannot be said to be ambiguous. *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) ("Contract language is ambiguous if it is reasonably susceptible of two or more interpretations or may have two or more different meanings." (internal quotation marks omitted)).

A hypothetical reasonable third party would, we believe, understand the costs associated with "collecting and selling" the tax credits to include the costs of securing those credits in the first place. To collect is "to receive, gather, or exact from a … source[]," Webster's Third New Int'l Dictionary 444 (1971), "to claim as due and receive payment for," Merriam-Webster's Collegiate Dictionary 243 (11th ed. 2005). In that sense, it would certainly be reasonable for a third party to understand the Contract to mean that the costs associated with claiming and securing the tax credits – *e.g.*, the necessary costs of posting collateral to obtain the credits in the first place – constitute costs of collecting them.

15

Lehigh points out that the Puerto Rican statute that provides for the granting of tax credits to purchasers of distressed businesses speaks, as the District Court said in denying Keller's motion for judgment as a matter of law, in terms of "claiming" the credits. (*See* App. at 24 ("The word 'collect' is not included in the law or regulations relating to the tax credit. The statute instead describes the process as 'claiming the credits.'").) But that semantic variance does not render Keller's interpretation unreasonable. At the least, it is reasonable to conclude that to *claim* a tax credit is functionally the same as to *collect* one. Collecting a tax credit is the corollary of paying taxes. In the case of tax payment, an entity pays taxes and the government *collects* them. With tax credits, the situation is reversed; the government issues the credits, which are *claimed* or *collected* by the taxpayer. The tax credit, once collected by the taxpayer, can then either be applied against profit or sold to some other entity that can apply them against profit. That is not an unreasonable understanding of the term *collecting*, which, after all, must be given some effect, lest it be rendered "illusory or meaningless." *O'Brien*, 785 A.2d at 287 (internal quotation marks omitted).[7]

In contrast, Lehigh's view is unreasonable because it would run afoul of ordinary rules of contract construction. The Contract plainly provides for the deduction of two things from the proceeds of the sale of the tax credits: (1) costs incurred in *collecting* the tax credits, and (2) costs incurred in *selling* the tax credits. (*See* App. at 1844, 2043 (providing for deduction of the costs of "collecting and selling such tax credits").) Yet

---

[7] That Keller in its correspondence with Lehigh spoke of "securing" the credits does not undermine this analysis.

16

Lehigh advocates a reading of the Contract that would expel *collecting* from its natural place at the head of the phrase antecedent to *tax credits*, and force upon it the unnatural role of modifying and applying, after the fact, to the costs of collecting the *proceeds of the sale* of the tax credits to a third party. That appears to be nothing but wishful thinking that "twist[s]" the language of the Contract "under the guise of construing it." *Rhone-Poulenc*, 616 A.2d at 1195. No hypothetical reasonable third party would read that meaning into the Contract without the benefit of extrinsic evidence of intent, and even then the interpretation is tortured. Because Lehigh's interpretation of the Contract would do substantial violence to the text of the Contract, and as such would likely not ring true to the ears of an objective reasonable third party, the Contract is not reasonably susceptible of Lehigh's interpretation. We are left with one reasonable interpretation, Keller's, and judgment for Keller is thus warranted as a matter of law.

## IV. Conclusion

For the foregoing reasons, we will reverse the District Court's denial of Keller's Rule 50 motion for judgment as a matter of law and remand with directions that judgment be entered for Keller on the Contract claim.